**Robert J. WILSON, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**LIBERTY HOMES, INC., Respondent.**

No. 80–C–221.

United States District Court, W. D. Wisconsin.

Aug. 18, 1980.

On Motion to Alter and Amend Sept. 6, 1980.

On Motion to Suspend Injunction Sept. 16, 1980.

Robert V. Johnson, N.L.R.B., Minneapolis, Minn., for petitioner.

E. Allan Kovar, Chicago, Ill., for respondent.

CRABB, Chief Judge.

This is a petition for temporary injunctive relief pursuant to § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), brought by the Regional Director of Region 18 of the National Labor Relations Board, pending final decision by the Board on charges that respondent has engaged in unfair labor practices within the meaning of §§ 8(a)(1), (3) and (5), 29 U.S.C. § 158(a)(1), (3) and (5). The respondent is Liberty Homes, Inc., operator of a mobile home manufacturing plant at Dorchester, Wisconsin.

Petitioner alleges that there is reasonable cause to believe respondent interfered with the protected rights of respondent's nine truck driver employees [1] by threatening and interrogating them regarding their union activities, and by unilaterally discharging them and subcontracting out its driving operations because of the drivers' support for the union. Petitioner requests an order enjoining respondent from further engaging in unfair labor practices, and directing respondent to resume its driving operations, rehire the nine discharged drivers, and recognize and bargain with the union, Chauffeurs, Teamsters, Warehousemen and Helpers, Local No. 446 (affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America).

Also pending is a motion by the union to intervene in this action.

### MOTION TO INTERVENE

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that an applicant may intervene as a matter of right if the applicant has an interest in the subject of the action, if disposition of the action may impair the applicant's ability to protect that interest, and if the applicant's interest is not adequately represented by the existing parties.

In this case there is no possibility that the outcome will adversely affect the union's ability to protect it interests. At worst, the union's interests will be unchanged as a result of a decision in this matter, whereas its interests will be advanced if all of the relief requested in the petition is granted.

It is relevant to note that even though it was the charging party before the Board, the union itself never had any power to petition under § 10(j) for temporary injunctive relief, nor could it compel the Board to so petition.[2] If, subsequent to this order, the union is unable to protect its interests by means of a petition for injunctive relief, that inability is a consequence, not of this order, but of Congress' decision to empower only the Board to bring such petitions, and only in furtherance of the public interest.

1. The nine are identified in paragraph 5(1) of the petitioner as: Dennis D. Gabrovic, Roger C. Kell, Peter J. Marchinek, Loren J. Metz, James L. Paschke, Kenneth F. Ploeckelman, Merlin J. Ramker, Dennis D. Schoelzel, and Arthur B. Strey.

2. Section 10(j) provides: "The *Board* shall have the power ... to petition any United States district court...." 28 U.S.C. § 160(j) (emphasis added).

*Muniz v. Hoffman*, 422 U.S. 454, 466–7, 95 S.Ct. 2178, 2185, 45 L.Ed.2d 319 (1975). That it is the intent of Congress to exclude charging parties such as the union from any form of participation in § 10(j) actions may be inferred from the fact that § 10(*l*) (pertaining to temporary injunctive relief in cases involving boycotts or strikes) expressly provides for such participation.[3] The union's motion for intervention in this action will be denied.

## PETITION FOR INJUNCTIVE RELIEF

■ Section 10(j) of the National Labor Relations Act authorizes the Board to petition this court for temporary relief whenever a complaint has issued charging a party with engaging in an unfair labor practice. So long as the Board has reasonable cause to believe that the charged party has violated the Act, this court has jurisdiction to order whatever relief is deemed just and proper. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 743 (7th Cir. 1976). In ruling on petitioner's request for injunctive relief, I will consider separately the "reasonable cause" and "just and proper" requirements.

*Reasonable Cause*

■ In making the first determination whether petitioner has reasonable cause to believe that respondent engaged in unfair labor practices, the court's task is limited to determining whether there is evidence which would support the Board's finding that there was reasonable cause to believe that respondent engaged in unfair labor practices, resolving all factual disputes in favor of petitioner. *Squillacote v. Graphic Arts International Union, AFL–CIO*, 540 F.2d 853, 858 (7th Cir. 1976).[4] Accordingly, for the limited purpose of determining whether reasonable cause exists, the focus will be on that evidence which favors petitioner's claim.

3. Section 10(*l*) provides that the charging party "shall be given an opportunity to appear by counsel and present any relevant testimony." 28 U.S.C. § 160(*l*).

4. Although the cited case was applying § 160(*l*) and the present petition is brought under

I find that evidence of the following facts was produced at the hearing held on May 30, 1980:

(1) In the summer of 1979, at a time when the drivers were discussing among themselves the possibility of joining the union, respondent's dealer relations manager, Tom Potts, approached several of respondent's drivers individually and asked about the union's organizing efforts and warned against supporting the union. He told one driver, "It would be a bad mistake to join the union."

(2) On September 24, 1979, the business agent for the union, Jerome Hansen, called on respondent's division manager, William Zabrosky, with cards signed by all nine of respondent's drivers authorizing the union to represent them. Zabrosky refused Hansen's request for voluntary recognition of the union on the grounds that he was without authority to grant recognition and that the driving operation was about to be subcontracted and the company's drivers terminated. The only time respondent offered to recognize the union was at a hearing on a representation petition filed by the union, and that offer was only for the limited purpose of negotiating the effects of the drivers' terminations.

(3) A representation petition filed by the union on September 26, 1979, was dismissed by petitioner on October 24, 1979, on the ground that the subcontracting of respondent's truck driving operation appeared imminent and that as a consequence no useful purpose would be served by conducting an election at that time.

(4) The drivers were not informed that they would be discharged until sometime in October or November of 1979. Their terminations became effective the first week in November.

§ 160(j), the distinction is not significant. In *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 743 (7th Cir. 1976), the court said that the standards to be used in applying the two sections are the same.

(5) Prior to 1979, respondent maintained a single 10,000 gallon capacity gasoline storage tank on the premises of its Dorchester plant, for the purpose of fueling the trucks driven by the discharged drivers. Sometime in 1979 a second 10,000 gallon capacity gasoline storage tank was installed at that plant. Also during 1979, four of respondent's trucks were equipped with new radial tires, and two new gas–powered trucks were purchased.

(6) Respondent had been losing money on its trucking operations since 1978 because an increasing percentage of its mobile homes were so large as to cause the rapid deterioration of the trucks owned by respondent and used for hauling the homes. The increasing size of the mobile homes was gradual and not unexpected.[5]

■ The complaint which underlies this petition charges respondent with committing unfair labor practices within the meaning of §§ 8(a)(1), (3) and (5). In proving that reasonable cause exists to believe one or more of the unfair labor practices charged has been committed, the burden of proof that petitioner must sustain is "relatively insubstantial." *Squillacote v. Graphic Arts International Union, AFL–CIO*, 540 F.2d 853, 858 (7th Cir. 1976). Moreover, in considering whether petitioner has sustained this minimal burden, all reasonable inferences are to be drawn in his favor. *Id.* Evaluated in light of these standards, the evidence recounted above is sufficient to support a conclusion that petitioner has reasonable cause to believe that respondent has violated the National Labor Relations Act.

Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate in regard to tenure of employment for the purpose of discouraging membership in a labor organization. Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights to organize

and bargain collectively through representatives of their own choosing. The United States Court of Appeals for the Seventh Circuit has described the relationship between these sections and an employer who subcontracts out part of its operations, as respondent has done here, as follows:

> It is well settled that an employer violates Sections 8(a)(3) and (1) of the Act by subcontracting part of an integrated business and dismissing the persons employed therein if the action is motivated at least in part by antiunion considerations. *NLRB v. National Food Stores, Inc.*, 332 F.2d 249 (7th Cir. 1964); *NLRB v. George Roberts & Sons, Inc., d/b/a The Roberts Press*, 451 F.2d 941, 845–946 [sic] (2nd Cir. 1971). Of course, as [employer] argues, the converse is true, i. e., an employer does not violate Sections 8(a)(3) and (1) if he makes a decision to subcontract solely for sound business reasons. *Jay Foods Inc. v. NLRB*, 292 F.2d 317 (7th Cir. 1961); *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170 (2d Cir. 1961).

*NLRB v. Townhouse T.V. & Appliances, Inc.*, 531 F.2d 826, 828–9 (7th Cir. 1976). Thus, the critical element in a controversy such as the present one is the employer's motivation. Here, when all reasonable inferences are drawn in petitioner's favor, there is ample evidence from which petitioner could conclude that respondent's decision to subcontract its trucking operations was not motivated solely by legitimate business reasons, but was motivated, at least in part, by anti–union considerations. There is evidence that respondent did not announce to the drivers its decision to subcontract their function until after respondent was faced with the union's demand for recognition and bargaining. In addition, there is evidence that shortly prior to subcontracting, respondent expended considerable capital to improve its trucking operations

---

5. "I have been at Liberty now since December of 1972 in Dorchester. When I came the product mix was primarily smaller and shorter units; and as the market matured, we perceived the greater numbers of large or larger mobile homes. The percentage of 14 × 70 foot long mobile homes was increasing during '77 and '78. And we certainly forecasted it to increase in '79, which in fact it did." Testimony of William Zabrosky, Transcript p. 111.

by purchasing new tires, new trucks, and a new gasoline storage tank. There is also evidence that the changes in mobile homes which increased the costs of respondent's trucking operations were gradual changes, and not sudden or unexpected. Finally, there is evidence that respondent retains its trucking operations at its plants in other states. This evidence could support a finding that, prior to the union's demand, respondent had the intention of maintaining its trucking operations and that the decision to subcontract was motivated, at least in part, by a desire to avoid a unionized trucking operation.[6]

The evidence also is sufficient to support petitioner's claim that there is reasonable cause to believe respondent has violated § 8(a)(5), which makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. There is evidence that on September 24, 1979, after obtaining authorization cards from 100% of the truck drivers, union agent Hansen demanded recognition from respondent's division manager and was refused. Respondent makes much of the evidence that at one point it did offer to recognize the union for the limited purpose of negotiating the effects of the drivers' terminations. However, petitioner argues that this limited offer is not sufficient to satisfy respondent's obligation to bargain in good faith. While ultimately it is for the Board to decide whether this argument is meritorious, I find that it is substantial and not frivolous, and that there is reasonable cause to believe respondent refused to bargain in good faith with the union.

■ The next question, then, is whether respondent had any duty to bargain with the union. The Supreme Court has stated the rule that "unless an employer has engaged in an unfair labor practice that impairs the electoral process, a union with authorization cards purporting to represent a majority of the employees, which is refused recognition, has the burden of taking the next step in invoking the Board's election procedure." *Linden Lumber Division v. NLRB*, 419 U.S. 301, 310, 95 S.Ct. 429, 434, 42 L.Ed.2d 465 (1974). Thus, the authorization cards alone do not create a duty to bargain and, by itself, respondent's refusal to bargain does not constitute an unfair labor practice. However, when respondent unilaterally decided to discharge its drivers and subcontract out its work, it left the union powerless to indicate its majority status by means of an election.[7] It is for the Board to decide whether a refusal to bargain, when coupled with conduct which frustrates the Board's electoral procedures, constitutes an unfair labor practice within the meaning of § 8(a)(5). Again, such a theory is substantial and not frivolous. Therefore, I find that as to this charge petitioner has met his burden of proving reasonable cause. *Squillacote v. Graphic Arts International Union, AFL–CIO*, 540 F.2d 853, 858 (7th Cir. 1976).

■■ It is a more difficult problem to determine whether the petitioner has reasonable cause to believe that respondent committed an independent § 8(a)(1) unfair labor practice when its dealer relations manager questioned the drivers and warned them against joining the union. It is unclear whether these questions and statements, standing alone, could form the basis

**6.** Respondent argues that it had legitimate business reasons for deciding to terminate its trucking operations, and it has produced evidence that its truckers have been operating at a loss since 1978. I have not evaluated this evidence in my discussion of reasonable cause because I need only decide whether there is evidence which could *support* a finding of illegal conduct, and because the existence of legitimate motivation is irrelevant if petitioner could find that respondent additionally was motivated by antiunion considerations. In any case, respondent's argument is unpersuasive because

respondent has never explained in what sense its trucks operated at a loss, because it continues to operate its own trucks at its other plants, and because it purchased two new gas–powered trucks at a time when the increasing size of its mobile homes and the rising maintenance costs of its trucks was foreseeable.

**7.** The union's representation petition was dismissed by petitioner precisely because termination of respondent's trucking operations appeared imminent.

for a finding that respondent committed an unfair labor practice within the meaning of § 8(a)(1), independent from the §§ 8(a)(3) and (5) violations. The United States Court of Appeals for the Seventh Circuit has said that "an employer's interrogation of an employee will not violate section 8(a)(1) unless the questions asked, viewed in context, would reasonably induce in the employee the fear of reprisal or the anticipation of a reward." *Lutheran Hospital of Milwaukee, Inc. v. NLRB*, 564 F.2d 208, 210 (7th Cir. 1977), vacated and remanded on other grounds, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145. Whether the Board could find that Potts's questions and statements would reasonably induce a fear of reprisal will depend largely upon the authority that the employees perceived him as having[8] *Utrad Corporation v. NLRB*, 454 F.2d 520 (7th Cir. 1971). There is no evidence in the record now before me to indicate the extent of Potts's actual or perceived authority. On this record I am unable to conclude that petitioner has reasonable cause to believe that an independent § 8(a)(1) unfair labor practice has been committed; however, this does not affect the conclusion that petitioner has reasonable cause to believe the other alleged unfair labor practices were committed.

*Just and Proper*

Having determined that petitioner has reasonable cause to believe that respondent has violated §§ 8(a)(3) and (5), if not (1), of the National Labor Relations Act, I turn to a consideration of whether the relief requested is "just and proper." *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 743 (7th Cir. 1976).

For the purpose of deciding what relief is just and proper, I make the following findings of fact:

8. Potts's *actual* authority does not determine respondent's liability. *Jays Foods, Inc. v. NLRB*, 573 F.2d 438, 445 (7th Cir. 1978).

9. In its answer to the petition, respondent averred that resumption of its trucking operations would cost more than $250,000. It is unclear what this figure represents. At the May 30,

(1) The relevant procedural history of this controversy is as follows: On October 24, 1979, the union filed charges with the Board alleging that respondent was engaging in unfair labor practices within the meaning of §§ 8(a)(1) and (3). On November 1, 1979, the union amended its charge to add allegations of unfair labor practices within the meaning of § 8(a)(5). Robert Wilson, Regional Director of Region 18 of the Board and petitioner in this action, investigated the charges and dismissed them on November 29, 1979. The union appealed the dismissal to the Board's general counsel, who sustained the appeal on April 9, 1980, and remanded the case to the regional office. On April 30, 1980, the regional office issued a complaint on the union's charges and set October 1, 1980, as the date for a Board hearing on the complaint. The hearing date was subsequently advanced to June 10, 1980. On May 19, 1980, the petition now under consideration was filed in this court.

(2) In 1973, after respondent's truck drivers signed cards authorizing representation by the union involved in the present controversy, respondent discharged its drivers and subcontracted out its driving operations.

(3) Respondent disposed of its Dorchester fleet of gas–powered trucks by selling three trucks and transferring eleven trucks (one of which has since been wrecked) to others of its plants, at which the trucking operations have been retained. The per unit cost of purchasing new gas–powered trucks is $14,500 to $15,000. Respondent could resume its trucking operations by recalling the existing ten transferred trucks, and purchasing four trucks to replace the three that were sold and the one that was wrecked. The maximum capital cost to respondent of re–equipping itself in this way to resume its trucking operations would be approximately $60,000.[9]

1980, hearing, respondent had an opportunity to present evidence of these predicted costs. It only introduced evidence relating to the purchase prices of new gas– and diesel–powered

(4) One of the benefits that the drivers hoped to obtain through unionization was safer working conditions. The concern was that the drivers were being sent out in winter at times when road conditions made it dangerous to haul the mobile homes.[10]

■ Petitioner has requested that respondent be enjoined from interrogating its employees regarding their relationship with the union; from threatening its employees with adverse consequences for conduct protected by the National Labor Relations Act; from discharging employees for anti–union reasons; and from interfering with any of the other rights of employees guaranteed by the Act. The conduct which petitioner seeks to enjoin is already made illegal by the Act, and the Act provides an adequate procedure for redressing violations. Accordingly, it is unnecessary to enjoin such conduct.

Petitioner also has requested that respondent be ordered (1) to resume its driving operations at its Dorchester facility and recall the nine discharged drivers; and (2) to recognize and bargain with the union retroactive to September 24, 1979, as the exclusive collective bargaining representative of respondent's drivers.

■ In determining whether the affirmative relief which petitioner seeks is just and proper, it is appropriate to consider: (1) the need for an injunction to prevent frustration of the basic remedial purpose of the National Labor Relations Act; (2) the degree to which the public interest will be affected by a continuing violation of the

Act; and (3) traditional equitable considerations. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976).

### A. Order to Resume Operations

■ Analyzing the request that respondent be ordered to resume its trucking operations in light of the three factors set out above, I conclude that the requested relief is just and proper. The first factor, the need for an injunction, has been construed to mean that interim relief is appropriate if the denial of such relief will cause "the efficacy of the Board's final order [to be] nullified." *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967). In this case, unless interim relief is provided, there is a strong likelihood that if and when the Board does finally order respondent to resume its trucking operations, the delay inherent in the Board's processes[11] will cause that order to be ineffective. There is a significant possibility that, by that time, the truck drivers who will be entitled to reinstatement as the result of a Board–issued resumption order will have accepted employment with other employers, perhaps in other locations, and will be understandably reluctant to disrupt once more their own and their families' lives in order to return to their former jobs. For whatever harms those drivers will have suffered, a final Board order alone will provide no relief.

In these circumstances, this union and unionism in general will be harmed. This union will be harmed because the unit it

trucks. Respondent had been using gas–powered trucks prior to subcontracting, and there is evidence that it had purchased two new gas–powered trucks during 1979. Therefore, I have calculated the costs of resuming operations using the price of gas–powered trucks. It should be noted that my calculation of the capital outlay required in order for the trucking operations to be resumed does not take into account the benefit that accrued to respondent when it sold the old trucks.

10. This finding is based on the testimony of Merlin Ramker, one of respondent's drivers.

11. In *Muniz v. Hoffman*, 442 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975), the Court quoted

the following from a Senate report on the rationale for the interim injunction provisions of the National Labor Relations Act:

"Time is usually of the essence in these matters, and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives–the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining." ... S.Rep. No. 105, 80th Cong., 1st Sess., 8 (1947).

*Id.* at 466, 95 S.Ct. at 2185.

once represented will have been irremediably dissipated. Unionism in general will be harmed because these drivers, having suffered as a consequence of their association with a union, may decide to avoid any involvement with unions in the future. Moreover, truck drivers and other employees at respondent's plants throughout the country may take this incident as a warning that the Board is impotent; that if they choose to deal with a union, they risk severe retaliation for which the Board can provide no effective remedy.

In a similar case, the United States Court of Appeals for the Seventh Circuit has described the harm that can result from the unfair labor practices with which respondent is charged. "Here the company discharged every driver because of his union activity and destroyed the bargaining unit by contracting out its work. No conduct more drastic, or more likely to have lingering, ineradicable effects can be imagined." *NLRB v. Townhouse T.V.*, 531 F.2d 826, 830 (7th Cir. 1976). If respondent's decision to subcontract in this action was motivated in fact by anti–union animus, then allowing its illegal conduct to continue until the Board acts would create a substantial risk of devastating and permanent harm of the sort that § 10(j) of the Act was intended to prevent. In view of this fact and in view of the need for employers and employees alike to know that such unfair labor practices will not go without effective redress, an interim resumption and reinstatement order is appropriate.

Respondent argues that such an order would be improper and unjust because of the financial burden that it would impose, and because when the union first filed these unfair labor practice charges petitioner found that the evidence did not warrant issuance of a complaint, and did not until seven months later come to this court seeking § 10(j) relief. Dealing first with the matter of petitioner's inconsistency and the resulting delay in filing a § 10(j) petition, I find no impropriety or injustice. True, it was only after review by the Board's general counsel that these charges were found to warrant Board intervention. However, in view of the fact that petitioner has more than satisfied the reasonable cause requirement, the petition is entitled to the same consideration that a petition would receive if it came to this court without having gone first through the Board's appeal procedure. Once the charges were remanded to petitioner, the petition was filed with this court reasonably promptly and, in any event, respondent has not demonstrated that it has been harmed by the delay. I do recognize the possibility that because of the delay it is already too late for a resumption order to be effective, but I believe that there is enough of a likelihood that the order will be effective to justify issuing it.

Respondent's argument that it will be unjustly burdened by a resumption order merits more thorough consideration, since there are decisions by the court of appeals for this circuit which could be construed to put in doubt the propriety of issuing such an order. *Jays Foods, Inc. v. NLRB*, 573 F.2d 438 (7th Cir. 1978); *NLRB v. Townhouse T.V. & Appliances, Inc.*, 531 F.2d 826 (7th Cir. 1976); *NLRB v. Major*, 296 F.2d 466 (7th Cir. 1961). Although the parties to this suit apparently do not consider these cases important (they were not discussed in the briefs), I consider them significant enough to warrant discussion.

In *Townhouse T.V.* the Board sought an enforcement decree against a television and appliance store company which, for a mixture of anti–union and legitimate business reasons, had discharged its four full–time and one part–time driver–installers and subcontracted out their functions. The company operated out of a single store, and prior to the discharges it owned two delivery trucks, which it subsequently sold. Although the court sustained the Board's finding that the company's conduct was illegal, it declined to enforce the Board's resumption order on the ground that it was too financially burdensome to be proper under the Act. Estimating the resumption costs to be more than $16,000, the court found that "the capital outlay ... will entail considerable burdens to this relatively small company, and their imposition must be

characterized as punitive rather than remedial." *Id.* at 831. The court also expressed concern that requiring the company to re-equip itself to resume its delivery services might be "an investment for no purpose" since the eventual outcome of the Board-ordered bargaining might be a return to subcontracting. *Id.* at 831.

If the facts in the present case were sufficiently like those in *Townhouse T.V.* to make it unlikely that a resumption order issued by the Board would be enforceable, then it would be unjust and improper to order that same relief on an interim basis. However, there are significant distinctions between *Townhouse T.V.* and this case. First, in deciding in that case that a financial burden of $16,000 was punitive, the court of appeals was considering the burden in relation to the small size of the company. In the present case, respondent has made no claims and produced no evidence regarding the impact upon it of an outlay of approximately $60,000. Clearly, respondent cannot be characterized as a "relatively small company" in the way that the single store company in *Townhouse T.V.* was; respondent manufactures and sells mobile homes that sell for large sums of money, and maintains several plants through the country. There is no evidence to suggest that the financial costs associated with the resumption of respondent's trucking operations will be a substantial burden upon respondent. Indeed, there is evidence to the contrary in the fact that respondent chose to dispose of its Dorchester fleet of trucks at a time when these unfair labor practice charges had already been filed, making a resumption order a foreseeable risk. In these circumstances, a resumption order is not punitive.

Second, as I have indicated above, there is reason to believe that if resumption is ordered now, less than 10 months after the allegedly illegal discharges, the order will have a remedial effect. In *Townhouse T.V.* the discharges occurred in September of 1973; the decision denying enforcement of the Board's resumption order was issued in March of 1976, two and one-half years later. In view of this delay and the conse-

quent likelihood that the five discharged employees were unavailable to return to their old jobs, it is easy to see why the court characterized enforcement of the resumption order as punitive rather than remedial; in contrast to the present case, in *Townhouse T.V.* irreparable damage was already done.

Finally, even if respondent in this case eventually re-subcontracts the trucking operations, the capital costs of resuming these operations at the Dorchester plant will not necessarily be wasted as they would have been in *Townhouse T.V.*, since respondent continues to be in the business of transporting mobile homes from its other manufacturing plants.

Some discussion is required also of two other cases in which the court of appeals for this circuit denied enforcement for resumption orders issued by the Board. As with *Townhouse T.V.*, however, neither is so similar to this case as to govern its disposition. In *NLRB v. Major*, 296 F.2d 466 (7th Cir. 1961), the court sustained the Board's finding of a § 8(a)(3) violation where an employer with anti-union animus discharged his drivers and sold his fleet of trucks, but denied enforcement of a resumption order, finding that the employer's anti-union feelings did not cause the occurrence of the discharges, which would have occurred for legitimate reasons in any event, but only caused the discharges to occur earlier than they otherwise would have. This case is distinguishable because, as I have already indicated, there is reasonable cause here to believe that anti-union animus motivated the fact of (as opposed to just the timing of) respondent's decision to subcontract.

In *Jays Foods, Inc. v. NLRB*, 573 F.2d 438 (7th Cir. 1978), the court sustained the Board's findings of §§ 8(a)(1) and (3) violations where an employer discharged its 26 truck drivers and subcontracted its trucking operations at least in part for anti-union reasons. The court found that 23 of the discharged drivers had been hired by the subcontractor with their new wages and benefits being equal to or better than those

they received from their former employer. The court denied the resumption order on the grounds that it would impose an unwarranted hardship on the subcontractor; that it would be disadvantageous to the 23 discharged drivers who had been employed by the subcontractor; and that there existed a sufficient alternative remedy for the three still unemployed discharged drivers (back pay until the drivers secured new employment). Significantly, the court said that the costs of rehiring the 26 workers and resuming operations would not be an undue hardship for the employer. Presumably, the court reached this conclusion after considering the resumption costs in relation to the size of the employer's total operations, which annually grossed sales in excess of $30 million. It is unclear in the present case whether a resumption order will be unduly burdensome, as in *Townhouse T.V.*, or not unduly burdensome, as in *Jays Foods*. However, it is the employer who must come forward with persuasive evidence of undue burden or other unusual circumstances in order to show that the otherwise normal and appropriate remedy of a resumption order is improper. Since respondent has failed to come forward with such evidence, I conclude that ordering respondent to resume its trucking operations is just and proper.

### B. *Order to Bargain*

 Turning next to petitioner's request that respondent be ordered to bargain with the union, I find that this relief, too, is just and proper. Without it, the basic remedial purpose of the Act is apt to be frustrated in two ways. First, in the time it takes for the Board to finally rule on these charges and obtain enforcement of any consequent orders, support among the truck drivers for the union may have eroded; erosion of support for the union in turn may unfairly diminish the union's bargaining strength if and when respondent is com-

pelled to bargain with it. Second, the longer respondent is permitted avoid negotiating with the union, the longer the truck drivers will be denied the benefits of a potential collective bargaining agreement. This is an especially important consideration since the benefits the drivers seek are not economic only, but also concern the safety of their working conditions. Moreover, since a bargaining order requires only that respondent bargain, and not that it reach any particular agreement, respondent will not suffer any irreparable harm from such an order.

There is no reason to suspect that ordering respondent to bargain now will artificially enhance the union's strength. Respondent never had any reason to doubt that the union enjoyed majority support. Respondent sought to avoid its bargaining obligation not on the ground that the authorization cards were inadequate to demonstrate the union's majority status, but on the ground that it was about to discharge the drivers.[12] If the union's majority status was never genuinely in doubt, then, in this case, the status quo which § 10(j) is intended to restore includes in this case the truck drivers as an organized work force, with the right to engage in good faith bargaining with respondent. *Seeler v. Trading Port Inc.*, 517 F.2d 33, 38 (2d Cir. 1975).

### ORDER

IT IS ORDERED that

(1) The union's motion to intervene is DENIED.

(2) Within thirty (30) days of the date of this order, respondent resume its driving operations at its Dorchester, Wisconsin manufacturing plant, and offer the following individuals re–employment as truck drivers: Dennis D. Gabrovic, Roger C. Kell, Peter J. Marchinek, Loren J. Metz, James L. Paschke, Kenneth F. Ploeckelman, Mer-

---

12. Even if respondent did doubt the union's majority status, it would not be unjust to require respondent to bargain. Under § 9 (c)(1)(B) of the Act, 29 U.S.C. § 159(c)(1)(B), respondent could have sought clarification of the union's status from the Board. In fact, the union petitioned the Board for certification under § 9(c) and it was *respondent* that precluded the holding of a representation election by unilaterally deciding to discharge the drivers and subcontract the driving operations.

lin J. Ramker, Dennis D. Schoelzel, and Arthur B. Strey.

(3) Respondent recognize and bargain with Chauffeurs, Teamsters, Warehousemen and Helpers Local No. 446, retroactive to September 24, 1979, as the exclusive bargaining agent of respondent's full–time and regular part–time over–the–road truck drivers operating out of respondent's Dorchester, Wisconsin plant.

## ON MOTION TO ALTER AND AMEND

In an order entered on August 18, 1980, respondent was given 30 days in which to resume its trucking operations, rehire the nine drivers it had previously discharged, and begin bargaining with the union representing those drivers. Respondent now moves this court (1) to alter or amend that judgment or, in the alternative, for a new trial, and (2) for a stay of the August 18 order pending a decision on the first motion. Respondent alleges seven grounds in support of its motions.

First, respondent contends that it has discovered new evidence suggesting that one of its former drivers falsely testified at the May 30, 1980, hearing. At that hearing the driver, Merlin Ramker, testified that he was not informed by anyone connected with management of respondent's plan to subcontract its driving operations prior to signing a union authorization card. Respondent now comes forward with evidence that Ramker subsequently testified under oath before an administrative law judge of the National Labor Relations Board (NLRB) that on September 29, 1979, he considered the impending subcontracting to be "old news." Respondent argues that this testimony "shatters petitioner's entire case which requires the key element that the union activity pre–date the knowledge of the company's decision to subcontract." I disagree. The fact that one or more drivers may have known of the decision to subcontract on September 29, 1979, is not material to whether the union activity predated the decision to subcontract. As the August 18, 1980, order indicates, there is considerable evidence, aside from Ramker's testimony,

from which the Board could conclude that there is reasonable cause to believe that respondent knew of its drivers' union activities in the summer of 1979, prior to deciding to subcontract, and that the decision to subcontract was motivated at least in part by anti–union considerations. Furthermore, contrary to respondent's claim, there is no discrepancy between Ramker's testimony on the two occasions in terms of whether he knew about the plan to subcontract before or after he signed the authorization card. On May 30, 1980, he testified that he had not been informed by respondent of the plan to subcontract prior to signing the authorization card on September 23, 1979. This is not inconsistent with Ramker's subsequent testimony that on September 29, 1979, six days after signing the card, the prospect of a subcontract was old news.

■ Second, respondent contends that I failed to give proper weight to uncontradicted evidence produced at the May 30, 1980, hearings which tended to show that respondent's decision to subcontract was made prior to any union organizing activity, and was motivated solely by legitimate business considerations. This argument reflects a misconception of the district court's role in actions brought pursuant to § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The court is not to weigh the evidence and determine the facts surrounding the labor dispute. *Squillacote v. Graphic Arts Intern. Union, AFL–CIO*, 540 F.2d 853, 858 (7th Cir. 1976). Rather, the court is, first, to assume that all factual disputes will be resolved by the Board in favor of the petitioner, and, second, to determine whether those facts together with all the reasonable inferences that may be drawn from them favorable to petitioner indicate that there is reasonable cause to believe that a violation of the Act has been committed. *Id.* Clearly, then, I need not accept as true the self–serving statements of respondent's representatives merely because they are uncontradicted. *See: Cavers v. Teamsters "General" Local No. 200, Intern. Broth. of Teamsters, Chauffeurs,*

*Warehousemen and Helpers of America*, 188 F.Supp. 184, 190 (E.D.Wis.1960). The fact that there exists evidence favorable to respondent does not alter the result at this stage, but only means that there are factual issues ultimately to be decided by the Board.

In connection with its challenge to the manner in which I evaluated the evidence in this case, respondent argues that there is error in the finding that resumption of its trucking operations would cost approximately $60,000. The $60,000 figure, however, is the only one that could reasonably be arrived at in view of the evidence. Although respondent had an opportunity at the May 30 hearing to produce evidence regarding the costs of resumption, it largely failed to do so and instead rested on the statement in its answer to the petition that resumption would cost more than $250,000. If respondent believed resumption truly would be this costly, it had an obligation to present evidence of the costs at the May 30 hearing.[1] Respondent will not now be granted a new hearing, causing further delay in this matter, in order to allow it to come forward with evidence that it could have presented on May 30.

Respondent's third and sixth claims are that the description of petitioner's burden of proof as "relatively insubstantial" in the August 18 order was improper, and that the evidence was insufficient to show a "likelihood of violation" of the Act. A similar argument was made in *Squillacote v. Graphic Arts Intern. Union AFL–CIO*, 540 F.2d 853 (7th Cir. 1976), and the court there stated:

> The unions' contention that the Regional Director must establish by "clear and convincing evidence" that reasonable cause exists to believe the charge is true is in error. On the contrary, "the Regional Director faces a relatively insubstantial burden of proof when he petitions a dis-

trict court for temporary injunctive relief pursuant to § 10(*1*)." (cite omitted)[2]

In any event, the evidence is sufficient even under the more rigorous "likelihood of violation" standard proposed by respondent.

█ Fourth, respondent argues that the impact on the public interest is not grave enough to warrant a § 10(j) injunction. Again, I disagree. As I indicated on pages 1128–1129 of the August 18 order, there may be widespread and serious repercussions from the unfair labor practices which it is reasonably believed respondent committed, and an injunction now is an appropriate remedy notwithstanding the delay that has been a part of the proceedings in this controversy. The threat to the public interest is substantial. Moreover, the degree to which the public interest is affected is only one of several factors to be considered in ruling upon a § 10(j) petition. (See page 1128 of the August 18 order).

Respondent's fifth claim is that insufficient weight was given to evidence that petitioner initially dismissed the unfair labor practice charges which underlie the present action. This issue is adequately addressed at pages 1129 1130 of the August 18 order; respondent has not raised any new arguments that would justify reexamination of the issue here.

█ Respondent's seventh and final claim is that the bargaining order issued on August 18 is improper because it does not result in restoration of the status quo, since the status quo prior to the subcontracting was that the truck drivers were not represented by the union. In response to this argument it is important to note, first, that restoration of the status quo is not the only consideration relevant to a decision on a § 10(j) petition. The need for an injunction to prevent frustration of the basic remedial purpose of the Act is also to be considered, and weighs in favor of a bargaining order here. Second, I disagree with the premise

---

1. For example, respondent now argues the impracticality of recalling the trucks transferred to its other divisions around the country. But no evidence of this was presented at the hearing, and there is no basis upon which I could make a finding of this on the present record.

2. As indicated in footnote 4 to the August 18 order, the standards used in applying §§ 10(*1*) and 10(j) are the same. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 743 (7th Cir. 1976).

that the drivers were not an organized work force prior to the subcontracting. I recognize that there exist at least two different viewpoints regarding what constitutes the status quo in § 10(j) cases.[3] However, in the present case, it appears that the union's majority status was never in doubt and that the status quo appropriately includes the drivers as an organized work force entitled to engage respondent in good faith bargaining.

For the reasons set forth above, respondent's motion for alteration or amendment of judgment or, in the alternative, for a new trial is DENIED. The motion for stay of judgment and for an order suspending granting of the injunction during the pendency of the motion for alteration of judgment is DENIED also.

## ON MOTION TO SUSPEND INJUNCTION

This case is presently before the court on respondent's motion to suspend the injunction issued August 15, 1980, pending an appeal to the United States Court of Appeals for the Seventh Circuit. The motion is made pursuant to Rule 62(c) of the Federal Rules of Civil Procedure.

 The factors to be considered in deciding this motion include (1) the likelihood that respondent will prevail on the merits of its appeal, (2) whether respondent will suffer irreparable harm if the injunction is not stayed, (3) whether petitioner will suffer substantial harm if the injunction is stayed, and (4) the public interest. *Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir. 1973).[1]

 As other courts have noted, it is difficult for a district court to objectively assess the likelihood that a party will succeed on appeal. However, the standard used by the appellate court in reviewing this injunction, issued pursuant to § 10(j) of

the National Labor Relations Act, 29 U.S.C. § 160(j), makes the likelihood of success for respondent a less than probable outcome. The United States Court of Appeals for the Seventh Circuit has stated this standard as follows:

> "It is sufficient to sustain the District Court's finding and conclusion if there be any evidence which together with all the reasonable inferences that might be drawn therefrom supports a conclusion that there is reasonable cause to believe a violation had occurred." [*Madden v. Int'l Hod Carriers' Building and Common Laborers' Union*, 277 F.2d 688, 692 (7th Cir. 1960), *cert. denied*, 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960)].

*Squillacote v. Graphic Arts Intern. Union, AFL–CIO*, 540 F.2d 853, 858 (7th Cir. 1976).

In addition, prior to issuing the injunction on August 18, 1980, thorough consideration was given to the question of whether the requested relief would be likely to be enforced by the circuit court if ordered by the Board. I concluded that it was. Under these circumstances, I must now find that respondent is not likely to succeed on the merits of this appeal.

 Respondent argues that the likelihood of success before the Board must also be treated as an important consideration. I disagree. The first part of the two–pronged test under § 10(j) is whether the Board has reasonable cause to believe that the charged party has violated the Act. This requirement is much more easily satisfied than a requirement that petitioner be likely to prevail before the Board. In this regard, § 10(j) injunctions are unlike other preliminary injunctions; for the latter, a showing of likelihood of success on the merits must be made. To require this same showing in § 10(j) actions at the stage of a Rule 62(c) motion would be effectively to replace the reasonable cause standard man-

---

3. *Compare, Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) with *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1194 (5th Cir. 1975), rehearing denied 521 F.2d 795, cert. denied 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385.

1. Although the court in *Adams* set forth these factors in the context of deciding whether an appellate court should stay a lower court's injunction, the same factors generally are considered by the lower courts in connection with a motion made pursuant to Rule 62(c). See, 7 Moore's Federal Practice ¶ 62.05 at 85–87 (1979–80 Cumulative Supplement).

dated by § 10(j) with the more stringent standards that govern other preliminary injunctions. In light of the clear language of § 10(j), it would be improper to apply that section in that manner.[2]

The remaining factors to be considered in deciding a Rule 62(c) motion concern the interest of, and potential harms to, the petitioner, the respondent, and the public. These factors were evaluated in the August 18 order and led to the conclusion that issuance of the injunction was just and proper. On the basis of the record of this case as of August 18, that conclusion is still warranted. However, with its brief and affidavit submitted in connection with the present motion, respondent is attempting to add to the record regarding the issues of the scope of its intended subcontract (extending to all of its divisions, and not just to the Dorchester plant), the cost of resuming its trucking operations, and the present employment status of its discharged employees. With respect to the scope of the subcontract and the costs of resuming its trucking operations, I will reiterate what was stated in the order of September 5, 1980 (denying respondent's motion for alteration of the judgment or for a new trial): the time to introduce evidence has passed. Respondent has suggested no reason why it could not have produced evidence on these matters at the May 30 hearing. Had it done so, perhaps the injunction issued August 18 would have been averted. However, in view of the damaging delays that have continually plagued this controversy and the necessity that no further delays be sanctioned, additional evidence will not now be considered.

With reference to respondent's contention regarding the employment status of its former employees, it must be noted that the August 18 order requires only that respondent *offer* reemployment to these nine individuals. If, as respondent avers, they now are engaged in employment elsewhere, and if they are sufficiently satisfied with their new jobs to decline employment with respondent, then respondent will be spared the expense of reemploying them and purchasing the trucks necessary for them to perform their former jobs. If their circumstances are such that they still desire their former jobs, then it is just and proper that they now be offered them.

For the reasons stated above, respondent's motion for an order suspending the August 18, 1980, injunction pending appeal is DENIED.

---

**2.** There is one respect in which the probable outcome of the Board's proceedings is relevant to a decision on a § 10(j) petition. There may be cases, unlike the present one, where the evidence strongly suggests that the Board will find that no violation of the Act has occurred. In such cases, a court may find it unjust and improper to order injunctive relief. In other cases it may be appropriate to order the injunction though it seems likely that the charged party will ultimately be vindicated by the Board. This is because success on the merits is only one of the factors to be weighed when making the "just and proper" determination. Also to be considered are other traditional equitable considerations, the need for an injunction to prevent frustration of the basic remedial purpose of the Act, and the degree to which the public interest will be affected if the charged unfair labor practice is allowed to continue. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976).