Daniel **SILVERMAN, Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**IMPERIA FOODS, INC., Respondent.**

**No. 86 Civ. 5608 (PWS).**

United States District Court, S.D. New York.

Oct. 10, 1986.

N.L.R.B., Region 2, New York City (Judy Minette Sandler, of counsel), for petitioner.

O'Donnell, Fox, Gartner & Sobolewski, P.C., New York City (William G. O'Donnell, Kenneth A. Bloom, of counsel), for respondent.

SWEET, District Judge.

Daniel Silverman, Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (the "Board") by order to show cause seeks a preliminary injunction to require the respondent Imperia Foods, Inc. ("Imperia") to rehire fourteen employees and to take certain other action. For the reasons set forth below, a preliminary injunction will issue.

**Prior Proceedings**

On March 24, 1986, Local Union No. 277, International Brotherhood of Teamsters, Chauffeurs & Warehousemen of America (the "Union"), filed a charge against Imperia alleging unfair labor practices violating Section 8(a)(1), (3) and (5) of the National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.* The Union alleged that Imperia discharged fourteen of its sixteen unit employees on March 24, 1986 because the unit employees authorized the Union to commence a strike at Imperia's New York facility and accelerated the relocation of its business operations from its New York facility to New Jersey without notifying the Union and without affording the Union an adequate opportunity to negotiate and bargain amounting to a repudiation of its collective bargaining relationship with the Union.

On May 30 the Regional Office issued a complaint alleging violations of Section 8(a)(1), (3) and (5) of the Act. Imperia in its answer admitted the discharge and the accelerated relocation of its operations from New York to New Jersey but denied the charges numbered 12(b)–19, which allege various violations of the Act. Imperia also set forth various affirmative defenses alleging that the Union refused to meet and bargain, that the last collective bargaining agreement between Imperia and Local 277 expired on February 28, 1986, and that the Union encouraged its members to commit acts of sabotage, to refuse overtime work, and to coerce numerous of respondent's customers to cease doing business with Imperia.

Simultaneously with the filing of the charge with the Board, the Union filed a request for injunctive relief pursuant to Section 10(j) of the Act. On July 17, 1986, the Regional Office of the Board filed this order to show cause for a preliminary injunction with the court. Pursuant to a consent order of July 21, the parties agreed that the official transcript and exhibits of the unfair labor practice hearing held be-

fore Administrative Law Judge Arthur Herman would be submitted in lieu of an evidentiary hearing. The hearing on the charges was completed on August 12 and the Board's brief was submitted on September 2. An informal request to extend the time for Imperia's brief to September 11 was granted without Board opposition, and a further extension was granted to September 17 over the objection of the Board and on that day the petition was fully submitted.

**The Facts**

Imperia is presently engaged in the processing and sale of grated cheese and bread crumbs. Ira Weissman ("Weissman") is the president and a 50% shareholder of the corporation. Sonny Ehrenworth ("Ehrenworth") is the vice president of Imperia and the other 50% shareholder of the corporation. The predecessor company to Imperia was a distributor known as A & M Dairy Products ("A & M") which prior to 1955 negotiated the initial labor agreement with the Union, at which time Imperia became the successor company.

More recently, an industry association known as the Butter & Egg Association (the "Association") has negotiated industry-wide collective bargaining contracts with the Union, which represented chauffeurs, helpers, dairy and food handlers, egg candlers, egg inspectors, butter packaging employees, cheese packing employees, egg breakers and office employees. Over time, the membership in the Association has shifted from being primarily food processors to food distributors, and, as a processor, Weissman has become less and less satisfied with the agreements the Association has reached with the Union. Imperia was a member of the Association and a signatory to the bargaining agreement with the Union, which expired on February 28, 1986.

Imperia was located at 168 Duane Street, a five-story building which consisted of approximately 17,000 square feet. It concluded it had to move out of this old, five-story building with unreliable elevators into a single-floor efficient, flowing manufacturing operation in the tri-state area. Imperia's net sales over the past three years have remained in the 5.0 to 5.2 million dollar area, while its costs were increasing significantly. According to his testimony, in March or April of 1985, Weissman entered into a transaction with Meile Rockefeller who wished to turn 168 Duane Street into coop apartments and agreed to trade the Duane Street building for a building that Weissman would designate in the ensuing 18 months. The advantage of this swap over a more traditional method of purchase and sale of real property is that the swap was tax free.

After Weissman signed the contract, rumors of a move began to circulate among the employees. To dispel uncertainty, Weissman held a company meeting at which he confirmed that the Duane Street Building would be sold and the business relocated to a yet unknown location. After weeks of investigation, Weissman located a suitable building in South Plainfield, New Jersey. In or about August, 1985, Weissman again met with his employees and reassured them that he wanted them to remain in his employ. He told them about the building in New Jersey. During the four months between the April and the August meetings, Imperia lost three to four employees who, according to Weissman, were unwilling to commute to the proposed New Jersey facility.

On November 22, 1985 the swap took place. Before and after the 22nd, Weissman met with architects, and projected the move into the new plant for late April, 1986, or, perhaps, earlier. In early December, 1985, the Union sent a 90–day notice to Imperia requesting negotiations for a new contract and in early January, 1986, Weissman received a telephone call from the chief negotiator for the Association. Weissman told the chief negotiator that he wanted to negotiate directly with the Union. No formal letter of withdrawal from the Association was made, nor was the Union notified directly of Imperia's position. Later in January, 1986, Weissman received a notice requesting the payment

of dues to rejoin the Association and authority to negotiate on Imperia's behalf. Weissman did not pay the dues nor did he sign the authorization form. After another call from the Association, Weissman requested the negotiator to advise Anthony Distini ("Distini"), president of the Union, that Imperia wanted to negotiate a separate contract with the Union.

Many of the unit employees lived in the Bronx, already far from the Duane Street plant, and the new plant was 35 miles further from Duane Street. Weissman was concerned that some of the employees might not undertake this additional commute to and from work every day. A number of Imperia employees visited the South Plainfield facility and one repaired and rehabilitated machinery there. Although some union members and perhaps its president were aware of some of the details of the intended relocation, no notice as such was given to the Union or the shop steward.

However, Jasper Brown, vice president of the Union ("Brown"), testified that on his bi-weekly visits to Imperia, the unit employees told him about the relocation, both in September, 1985 and again in December, 1985 and January, 1986 when he was told that machinery was being moved to the New Jersey plant which Imperia had purchased.

The collective bargaining agreement between the Union and the Association expired on February 28, 1986, negotiations were held and by March 14, a proposed new agreement had been reached, subject to Union ratification on March 15. On March 10, there was posted on the bulletin board of Imperia a notice of a meeting by the Union advising the employees that a meeting was to take place on March 15, 1986. On March 14, Weissman received a call from Distini after the negotiations with the Association had been completed. Distini stated that negotiations with the Association had been completed and that he understood that Weissman did not want to be a party of the Association and sought a separate contract. Distini told Weissman that he did not want to negotiate over the phone. Weissman agreed to set up a meeting with Distini. The same day Weissman spoke to an employee Carmen Mendez ("Mendez") who, in response to his inquiry, stated that morale was low because a contract has not been signed and that all employees would go to New Jersey. No prior contact had been sought by the Union or Imperia on the subject of a new collective bargaining agreement to replace the prior agreement other than the December 15 notice.

Weissman and his secretary and administrative assistant became concerned about the lack of productivity during the week of March 10 and conversations on the subject were held with individual employees but the issue was not addressed to the Union. On March 16 an employee observed a machine that required repair as a consequence of what he concluded was sabotage and he so advised Weissman. Imperia employees now working in New Jersey have testified that these acts resulted from the employees' effort to compel Imperia to reach a contract with the Union.

The Imperia records reveal the following overtime hours:

| Week Ending | | |
|---|---|---|
| | Feb. 7, 1986 | 112 hours |
| | Feb. 14, 1986 | 77¾ hours |
| | Feb. 21, 1986 | 51¾ hours |
| | Feb. 28, 1986 | 101¼ |
| | March 7, 1986 | 38½ hours |
| | March 14, 1986 | 15¾ hours |
| | March 21, 1986 | 27 hours |

In addition, the weekly sales dropped some $40,000.00 from the end of February to March, 1986.

No evidence was adduced that the Union instructed or encouraged employees to engage in any type of work misconduct such as slowing down or refusing to work overtime. Imperia never informed the Union or the shop steward of any of the alleged "problems" it had with employees during March, and employees were neither warned nor disciplined about their work or any of the alleged aforementioned work misconduct.

On Monday, March 17, Weissman called the Union to tell Distini that he was ready to discuss a new contract. He was told that Distini was on vacation for two weeks. The call was returned shortly by Brown, who reported that the Union and the Association had reached an agreement which the Union had ratified and that a vote had been taken to authorize a strike against non-signatories. Weissman agreed to meet with Brown on Wednesday, March 19, 1986. During this period Weissman was told from employees that a strike might be very imminent. On March 18, 1986, Weissman asked his contractor if it would be possible for Imperia to move to the new premises over the weekend of March 22, 1986, and stated that if he were not able to move quickly, he would be struck. Weissman cancelled the March 19 meeting with Brown.

On March 21, Brown called Weissman, was told he was out of town, and Brown's call was not returned. Imperia moved to the New Jersey facility over the weekend of March 22, 1986.

On Monday morning, March 24, and without any direction from management, both the day and the night shift arrived at Duane Street around 7 a.m. Weissman gave the employees a past week's wages plus a week's vacation pay and a letter which read:

> Imperia Foods, Inc. has moved its operations to another state, namely New Jersey. Therefore, effective NOW, we are terminating your employment.
>
> We thank you for your efforts, unfortunately, they were not enough to overcome higher costs, no growth, and stiff lower competition. It is a matter of survival.
>
> .　　.　　.　　.　　.
>
> We wish you best of luck for the future.
> The Management

The fourteen of the sixteen union employees discharged were: Pedro Arroyo, Pedro Astudillo, Angel Erazo, Pablo Garcia, Ada Lucas, Carmen Mendez, Miguel Monge, Felipe Rivera, Ramon Ruiz, Elbyn Salazar, Jose Sanchez, Juan Santiago, Victor Santia-go and Victor Torres. Angel Class and Ismael Rodriguez were not discharged.

All of the employees and Brown travelled to the South Plainfield plant, arriving around 12:30 p.m. After Brown and Weissman conferred briefly, the Union put a picket line outside with signs which read, "STRIKE" and "LOCKOUT." Weissman received the Association's contract and told Brown his attorney would have to review it. Later Weissman told Distini that a certain Herman Rosenman ("Rosenman") would negotiate for Imperia and gave Distini a telephone number. Rosenman said he would get back to the Union but did not, despite a subsequent request.

## Conclusions

The National Labor Relations Act § 10(j), 29 U.S.C. § 160(j), empowers the Board to seek temporary relief when, in its discretion, the Board determines that unrelieved delay in remedying the unfair labor practices would frustrate the basic purpose of the Act. *See Seeler v. Trading Port, Inc.,* 517 F.2d 33, 37–38 (2d Cir.1975); *Fuchs v. Hood Indus.,* 590 F.2d 395, 397 (1st Cir.1979); *Levine v. C. & W. Mining Co.,* 610 F.2d 432, 436–37 (6th Cir.1979); *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 741–43 (7th Cir.1976). Under this provision, the issues before a district court in a Section 10(j) proceeding are whether there is "reasonable cause to believe" that a violation of the Act, as charged, has been committed and whether injunctive relief is "just and proper." *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1030 (2d Cir.1980); *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d 1047, 1051 (2d Cir.1980); *Trading Port,* 517 F.2d at 36–37.

As to the first of the two issues, a district court is not required to find that "an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals.'" *Mego Corp.,* 633 F.2d at 1030; *Danielson*

*v. International Org. of Masters, Mates & Pilots,* 521 F.2d 747, 751 (2d Cir.1975) (discussing standards for § 10(*l*) injunction); *McLeod v. Compressed Air, etc., Workers, Local 147,* 292 F.2d 358, 359 (2d Cir.1961). The "reasonable cause" standard does not require the Board to adduce evidence to the extent required in a full hearing on the merits. The district court is not required to resolve disputed issues of fact or credibility. As the court explained in *Danielson v. Joint Board,* 494 F.2d 1230, 1245 (2nd Cir.1974):

> When "reasonable cause to believe" turns on disputed issues of fact, the Regional Director may assume these in favor of the charge and the District Court should sustain him if his charge is within the range of rationality. If differing inferences may fairly be drawn from the facts he has found, he may choose the one more favorable to the charging party, and this too should be upheld.

In this regard, "[e]ven on an issue of law, the district court should be hospitable to the views of the [Regional Director], however novel." *Danielson v. Joint Board of Coat Workers Union,* 494 F.2d at 1245. In other words, unless "convinced that the [Regional Director's] legal position is wrong," *International Org. of Masters, Mates & Pilots,* 521 F.2d at 751, the district court "should defer to the statutory construction urged by the [Regional Director]," *id.* Altogether, in making the "reasonable cause" determination, the district court properly gives the Regional Director's position on both the facts and the law great weight. Of course, to give the Regional Director's position great weight is not to make it dispositive. For instance in *Silverman v. 40–41 Realty Assoc.,* 668 F.2d 678, 681 (2d Cir.1982), the Second Circuit vacated an injunction issued by a district court on the basis of a "novel and unprecedented" application of a statute.

As to the second of the issues before the court in considering a § 10(j) application, the NLRB has argued that once the district court makes a finding that there is reasonable cause that a violation has occurred, then "an injunction *must* issue." Petitioner's Brief at 28 (emphasis added). If this were so, it would gut the second prong of the § 10(j) test, the prong which requires that the district court find that the requested relief is "just and proper."

■ As is the case with so many equitable remedies, the issuance of a § 10(j) injunction is within the sound discretion of the district court. *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1030 (2d Cir.1980) (Friendly, J.); *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union, ILGWU,* 494 F.2d 1230, 1244 n. 22 (2d Cir.1974). In exercising that discretion, a court considering a § 10(j) application "must act in accordance with the general rules of equity." *Mego Corp.,* 633 F.2d at 1033. *See also Silverman v. 40–41 Realty Assoc.,* 668 F.2d 678, 680 (2d Cir.1982) ("general equitable principles apply in deciding the propriety of a temporary injunction issued under section 10(j)"); *McLeod v. General Electric Co.,* 366 F.2d 847, 849 (2d Cir.1966) (§ 10(j) "in no way changed the extraordinary nature of injunctive remedy"), *vacated as moot,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). This means that the court must engage in traditional equitable inquiries concerning irreparable harm, preservation of the status quo, and the balance of hardships. For instance, in *McLeod v. General Electric Co.,* 366 F.2d 847 (2d Cir.1966), *vacated as moot,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967) (per curiam), the Circuit Court vacated a district court's § 10(j) injunction on the general equitable grounds that the requisite "extraordinary grounds" were not present to justify the "extraordinary nature of the injunctive remedy." *Id.* at 849.

The Court of Appeals has, however, somewhat tempered the customary rules for injunctions by cautioning that general equitable principles must be "conditioned by the necessities of the public interest which Congress has sought to protect." *Seeler v. Trading Port,* 517 F.2d at 39–40, (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754

(1944)). Thus, "the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." *Id.* at 40 (quoting *Hecht Co.* 321 U.S. at 331, 64 S.Ct. at 592). *Accord Morio v. North American Soccer League,* 632 F.2d 217, 218 (2d Cir.1980).

In this case the Regional Director's application of the statute does not appear to be at the absolute frontier of the law as was the case in *40–41 Realty.* Section 7 of the Act, 29 U.S.C. § 157, guarantees to employees the right "to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of their mutual aid or protection...." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), implements this guarantee by making it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in Section 7." Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment ..." in order "to discourage membership in any labor organization." Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), provides that it is an unfair labor practice "to refuse to bargain collectively with the representatives of his employees...."

█ The facts and the reasonable inferences drawn from them to which the NLRB is entitled clearly provide a reasonable basis to conclude that a violation of the Act has been committed. Although its contract with the Union had expired, Imperia remained under a statutory duty to negotiate with the Union concerning a new one. In a letter dated September 18, 1985, the Union asked Imperia to "PLEASE GET IN TOUCH WITH US AT YOUR EARLIEST CONVENIENCE TO SET A MEETING DATE FOR SUCH NEGOTIATIONS." No action was taken by Imperia. Communications between the Union and Imperia after the Union reached an agreement with the Association, are set forth above. No meetings or even discussions were held, no drafts were exchanged, no bargaining took place. Even if it is assumed, as Imperia does, that the Union would insist on an unmodified Association contract, Imperia remains under a duty to bargain, a duty which it did not perform. Parenthetically, refusal of the Union to provide Weissman with a copy of the Union/Association agreement until they sat down with him may indicate that an agreement could have been reached if Imperia had bargained in good faith. The facts here establish reasonable cause to believe that a violation has been committed.[1] *See Ox-Wall Products Mfg. Co.,* 135 NLRB 840, 841 (1962) *enf'd* 310 F.2d 878 (2d Cir.1962) (employer accelerates move to new site because workers vote for union recognition and request bargaining). *See also Kaynard v. MMIC, Inc.,* 734 F.2d 950 (2d Cir.1984) (employer threatens to close shop if workers join union); *NLRB v. Winchester Electronics,* 295 F.2d 288 (2d Cir.1961) (pro-union employees laid off during negotiation of initial contract with management).

Imperia says that it moved to New Jersey the weekend of March 22 in advance of its intended relocation date because it feared a strike resulting from its refusal to bargain with the Union with respect to the Association contract or a modification of that contract. This fear resulted from what Imperia perceived as a slowdown and possible sabotage in the preceding week after the Union and the Association had reached an agreement, and, therefore, seeks to justify its discharge on *Wright Line* grounds, 251 NLRB 1083 (1980), arising out of the slowdown and sabotage. However, its position is undercut by its failure to negotiate with the Union on those issues, on the contract, or the discharge. Indeed, the letter of Imperia

---

1. Because Imperia refused to negotiate with the Union *at all,* the parties have not litigated before this court the question of the full extent of Imperia's obligations in negotiating issues in a new contract relating to employee transfers, and it is unnecessary in resolving this case to address what Imperia would have had to discuss if they had ever deigned to come to the table.

which accompanied the discharge made no reference to any employee misconduct and the discharge was explained only in terms of the need to relocate as a consequence of economic factors. Had only those refusing to work overtime been disciplined or not transferred a different result might be in order. Instead, the mass discharge "without any warning, consultation, or negotiation" destroyed any possibility of responsible negotiation. *Johns-Manville Products*, 223 NLRB 1317, 1318 (1976).

Therefore, injunctive relief is "proper and just," and Imperia is directed to offer reinstatement of the discharged employees. Without such relief, the situation is subject to change to the point at which any final order of the Board would come "too late to prevent [the employer] from obtaining its objectives by unfair labor practices." *Reynolds v. Curley Printing*, 247 F.Supp. 317, 324 (M.D.Tenn.1965). With each passing day, the integrity of the bargaining unit erodes, and may result in the frustration of the Act even in the event that the Board finally rules in the Union's favor. In a similar situation, another district court characterized the irreparable harm this way:

> There is a significant possibility that, by [the time the Board rules in the Union's favor], the [employees] who will be entitled to reinstatement as a result of a Board-issued resumption order will have accepted employment with other employers, perhaps in other locations, and will be understandably reluctant to disrupt once more their own and their families' lives in order to return to their former jobs. For whatever harms those [employees] have suffered, a final Board order alone will provide no relief.

*Wilson v. Liberty Homes*, 500 F.Supp. 1120, 1128–29 (W.D.Wis.1980), *aff'd* 108 LRRM 2699, 2707–08 (7th Cir.1981), *vacated as moot and opinion withdrawn from publication*, 673 F.2d 1333, 109 LRRM 2492 (7th Cir.1982). *See also Kaynard v. Palby Lingerie*, 625 F.2d 1047, 1053 (2d Cir.1980) (affirming reinstatement to avoid "serious adverse import on employee interest in unionization"); *Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d 902, 907 (3d Cir.1981) (finding irreparable harm to bargaining unit by discharge of employees); *Balicer v. Helrose Bindery*, 82 LRRM 2891 (D.N.J.1972).

■ Further, in order to protect the collective bargaining process, Imperia is required to bargain with the Union. As the Second Circuit has said, "when a union loses its majority as the result of unfair labor practices, it is essential not to freeze the situation, but rather to re-establish the conditions as they existed before the employer's unlawful campaign." *Seeler v. Trading Port*, 517 F.2d 33, 38 (2d Cir.1975) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)). It is "[t]hose previous conditions [which] constitute the status quo which courts should restore through the issuance of a bargaining order under § 10(j)." *Id.* at 38–39.

Submit order on notice.

IT IS SO ORDERED.