## JAYS FOODS, INC. and Nielsen Brothers Cartage Co., Inc., Petitioners,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–1326.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1977.

Decided March 15, 1978.

Rehearing Denied April 6, 1978.

---

Bernard M. Kaplan, Skokie, Ill., for petitioners.

Elliott Moore, Deputy Assoc. Gen. Counsel, Howard E. Perlstein, Susan Tepper Papadopoulos, Attys., N. L. R. B., Washington, D. C., for respondent.

Before SPRECHER, Circuit Judge, COWEN,* Senior Judge and WOOD, Circuit Judge.

COWEN, Senior Judge.

Petitioner, Jays Foods, Inc. (hereinafter Jays), asks this court to review and set aside an order of the National Labor Relations Board disposing of two consolidated cases heard before the Board. The question before us is whether substantial evidence on the record as a whole supports the Board's findings that Jays violated the National Labor Relations Act sections 8(a)(1) and (3), 29 U.S.C. sections 158(a)(1) and (3) (1970).[1]

We find this a close and difficult case in which there is a great deal of conflicting evidence on many of the crucial questions. If we were deciding the case *de novo,* we might very well have made findings and conclusions contrary to some of the Board's determinations. However, we adhere to the limited scope of our review, and after reviewing the 1326-page record, we have concluded that the Board's findings regarding Jays' violations of the Act are supported by substantial evidence. Nevertheless, we find that the remedy provided by the Board in one case, 13CA–13889, is contrary to the recommended decision of the Administrative Law Judge and is not warranted by the record before us. Therefore, we hold the Board's order in this aspect to be an abuse of discretion and modify it to conform to the recommendations made by the Administrative Law Judge.

*Board Disposition*

The following is a statement of the facts to the extent deemed necessary for decision.

---

* Senior Judge Wilson Cowen of the United States Court of Claims is sitting by designation.

1. The Act provides:
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [the right to organize, form, join, or assist labor organizations];
   
   \* \* \* \* \* \*
   
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage *membership in any labor organization* \* \*."

The statement adheres to the Board's findings, which adopted those made by the Administrative Law Judge after he had sifted and weighed the voluminous and conflicting evidence presented during the 8 days of hearings before him.

Jays is an Illinois corporation which produces and packages snack foods in Chicago. The company asserts it is the largest independent snack food producer in the United States, with annual gross sales in excess of $30 million. In the fall of 1975 Jays employed 26 tractor-trailer drivers, who delivered Jays' products from its production plant in Chicago to its distribution centers (hereinafter branches) in the Chicago area and to independent distributors in four states. Jays has a much larger group of employees, called route salesmen, who deliver and sell Jays' products from its branches in the Chicago area to retail stores in the area.

### A. *Edward Olson's case*

Until December 1, 1975, when he was discharged, Edward Olson was one of the route salesmen. At the time of his discharge, Olson had worked for Jays for over 20 years, and at his branch, the West Branch, he stood first in seniority among 24 salesmen. Earlier in 1975, Olson had become concerned that Jays' route salesmen were not represented by a union. On his own, he contacted the Retail Clerks Union in an effort to have that union organize Jays' route salesmen. At the union's request, he openly distributed union authorization cards among the other 23 route salesmen at the West Branch, and successfully solicited 19 signatures. He also persuaded a number of his fellow salesmen to attend a dinner meeting with union representatives. Jays' West Branch supervisor, William Brand, was aware of this meeting. At the election conducted by the N.L.R.B. on October 2, 1975, the union lost. Olson served as the union observer of the election for the West Branch.

Immediately following that October 2 election, Jays' company president, Leonard Japp, Sr., approached Olson, extended his hand, and in an unfriendly, insincere tone said, "Thanks a lot, Ed." Then, for a period of time during November 1975, Jays' executive vice-president, Silas Marttila, ordered the newly appointed West Branch Assistant Manager, Donald Skafgaard, to follow Olson on his route because Olson was pro-union and because his sales were down. On Monday, December 1, 1975, after Olson had apparently disregarded one of his sales duties the previous Friday, the day after Thanksgiving, he was fired. Olson had not previously been warned, disciplined, or suspended for a similar neglect of his duties. In fact, there was no evidence Olson had ever disregarded such duties in his previous 20 years of employment with Jays. Jays alleges that Olson was fired for the following reasons:

> Very poor sales, lowest in West Branch. Caused by least amount of on-job sales time, 4 days only week of 11/29/75. He allowed two accounts, one Jewel and one National, to be out of stock on Jays items for the week-end 11/29 & 11/30 due to no-sale by him 11/28/75.

> \*     \*     \*     \*     \*     \*

> No arrangements made by E. Olson for delivery of product on Saturday 11/29/75. He knowingly permitted and approved out of stock for Customers & resultant loss of sales to Customers & Jays when he checked out for the week 11/29/75 disregarding opportunity available for completing his Route Sales on 11/29/75, increasing his sales commissions and satisfying Jays Customers. [Petitioner's app. 65–66.]

The Board adopted findings with respect to Olson's negligent performance on the 1975 Thanksgiving weekend that:

> \* \* \* the discharge of a new employee might not be noteworthy, although the record indicates that the discharge of [route] salesmen by Jays is not frequent. However, the discharge of a salesman with over 20 years seniority who apparently had never done anything like this before requires closer consideration. \* \*
> [Petitioner's app. 69–70.]

After closer consideration, the Board noted that while Olson's dollar volume of sales had been consistently in the lower half among the salesmen at the West Branch, his sales were not consistently lowest, as Jays alleged. The Board also found that Olson's route was smaller in size and lower in sales potential than other more lucrative West Branch routes. This was borne out by the fact that Olson's replacement continued to have low rankings among the West Branch salesmen after Olson's discharge. Finally, as to the incident, which allegedly precipitated Olson's firing, the Thanksgiving weekend non-delivery, the Board found that although Olson in fact had failed to service the Jewel store, he was not allowed to service the store because he arrived there 10 to 20 minutes after Jewel's receiving hours on Friday. Moreover, when Mr. Brand, the West Branch supervisor, had been apprised of the non-delivery by Olson when he checked out for the week that afternoon, Brand did not remind Olson to service the Jewel store on Saturday. As to the National store, Olson testified that he had checked the stock at that store; that the shelves had a supply of 3 dozen Jays' snack items, and that the manager at that store would not, as a regular policy, permit additional Jays' stock to be placed in the store's backroom. On the whole, the Board concluded that "Olson was discharged for his union activities and the reasons advanced by Jays are pretexts." [Petitioner's app. 71.]

### B. *The tractor-trailer drivers' case*

During the late summer and early fall of 1975 some of Jays' tractor-trailer drivers (hereinafter truckdrivers) became convinced that Jays' management was not acting in good faith regarding an agreement previously made between management and the truckdrivers. Because of Jays' claimed short-term financial difficulties, it was agreed that Jays could defer until January 1, 1976, a wage increase which the management originally promised to grant on July 1, 1975. During September, one driver, Richard McCormick, contacted the Teamsters' Union to discuss the possibility that the

Teamsters might organize Jays' truckdrivers. Six of the truckdrivers met with agents of the Teamsters on September 26 at the Teamsters' hall. At that time, the six signed authorization cards and scheduled a meeting for Saturday, October 4, between the Teamsters and as many of the other 26 truckdrivers as the six could convince to attend. During the following week, while at work, the six truckdrivers tried to persuade their fellows to attend the October 4 meeting.

On Friday evening, October 3, Jays' executive vice-president, Marttila, called a special meeting of the truckdrivers. He announced that the financial condition of Jays had improved and that the company would make the deferred raise effective immediately instead of waiting until January 1, 1976. He added, however, that he had heard "a few" of the "fellows have contacted a union," and if he knew who these truckdrivers were, he would not give them the raise, but since he did not know, he would have to give the raise to everyone. He also told them if they wanted a union, they should return to the union which had previously represented them and which they had since rejected. He finished with the statement that "you fellows aren't loyal to anyone but yourselves." [Petitioner's app. 38–39.]

Shortly after this meeting with Marttila, company president Japp met truckdrivers Davis and Dietz in the company dispatch office where he inquired whether they intended to attend the meeting the next day. They gave noncommittal replies, to which he responded that if the truckdrivers signed cards to bring in the union he would "close the doors."

On a number of occasions during September, October, and November 1975, John Staton, who supervises Jays' loading dock employees, asked various truckdrivers if they had contacted a union. The truckdrivers consistently responded in the negative. Staton also inquired why they wanted a union, to which there was either no response or a noncommittal one. On at least two occasions he added that if the truckdri-

vers kept fooling around with the union, the "old man," Jays' president, Japp, was going to sell the trucks, that is, contract out the tractor-trailer facet of Jays' operations to a hauling contractor.

A similar statement that the "old man" was getting "pretty mad" and was "going to sell the trucks" was conveyed to truck-driver James Paluch by Arthur Timmons during one of Paluch's deliveries to Jays' North Branch after the October 3 meeting. Timmons is Japp's son-in-law and his wife is a company stockholder. Timmons performed specialized duties for vice-president Marttila and frequently substituted for branch managers who were absent for one reason or another.

On November 14, 1977, Marttila informed the truckdrivers that Jays had contracted out its tractor-trailer operation to Nielsen Cartage Company. Nielsen took over the operation on November 17, 1977, and hired 15 of Jays' 26 truckdrivers. At that time Nielsen did not hire most of the key union proponents, almost all of whom were among the top half of Jays' truckdrivers with respect to seniority. Later in January 1976, Nielsen hired eight of the 11 remaining former truckdrivers, bringing the total number of former Jays' truckdrivers employed by Nielsen to 23 out of 26.

Except for a few statements made by John Staton, Jays' Assistant Shipping Supervisor, the testimony of Jays' executives and supervisory officials was contrary to the testimony of witnesses relied on by the Administrative Law Judge in making his findings. Jays' executives and officials claimed that the contract with Nielsen was motivated solely by economic considerations and that they were convinced that Jays could save $60,000 to $100,000 per year by contracting out the hauling operation to Nielsen. They further asserted that the Nielsen deal was basically formed and nearly solidified in late August and early September of 1975, prior to any union activity by Jays' truckdrivers. The Board found, however, that Jays had consistently spurned Nielsen's approaches for a number of years and did not seriously consider and decide to accept Nielsen's offer until late September and early October of 1975, a time frame contemporaneous with the union activity of Jays' truckdrivers discussed above.

In summary, the Board found persuasive evidence to support its conclusions that: (a) By contracting out its delivery operations because of the union activities of its employees, Jays had engaged in unfair labor practices in violation of sections 8(a)(1) and (3) of the Act; (b) By discharging its truckdrivers on account of their union activities, Jays had engaged in unfair labor practices in violation of sections 8(a)(1) and (3) of the Act, and (c) By threatening to sell its trucks and to close its doors because of the union activity of its employees, by granting benefits to them to discourage union activities, by threatening to withhold benefits because of employee union activities, and by coercively interrogating employees concerning union activities, Jays had engaged in unfair labor practices in violation of section 8(a)(1) of the Act. The Board also concluded on the basis of its findings that by discharging Edward Olson on account of his union activities, Jays had engaged in unfair labor practices in violation of sections 8(a)(1) and (3) of the Act.

### The Olson Case

We first consider Jays' challenge to the Board's findings pertaining to Edward Olson. We recognize, as did the Board, that Olson was negligent in the discharge of his duties. But in *N.L.R.B. v. Fairview Hospital*, 443 F.2d 1217, 1219 (7th Cir. 1971), it is stated:

As this Court has long recognized, the existence of valid grounds for punitive action is no defense unless such action was predicated solely on these grounds and not by a desire to discourage protected activity. * * *

Therefore, the issue is whether there is substantial evidence to support the Board's finding that Olson's discharge was motivated, at least in part, by his union activity, even though there may have been other, justifiable reasons for his dismissal. *N.L.R.B. v. Tom Wood Pontiac, Inc.*, 447 F.2d

383, 386 (7th Cir. 1971); *Borek Motor Sales, Inc. v. N.L.R.B.,* 425 F.2d 677, 680–81 (7th Cir. 1970). The Board essentially found that the reasons advanced by Jays to justify Olson's discharge were contrived and inadequate in the face of close scrutiny. *See N.L.R.B. v. American Casting Serv., Inc.,* 365 F.2d 168, 172 (7th Cir. 1966).

▇ The discharge of Olson presents by far the closest and most difficult question in this case, so close that it teeters on the balance. However, Jays has not persuaded us that the Board made unreasonable inferences from the direct and circumstantial evidence. The facts with respect to the Olson situation are comparable to those before the court in *Tom Wood Pontiac, Inc., supra,* which upheld the Board's decision. There is enough evidence from which a reasonable person might justifiably infer that Olson's discharge was due in part at least to his union activity. This is enough for affirmance of the Board's decision. *N.L.R.B. v. Columbian Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

Jays relies upon several cases decided by other circuit courts, which overturned Board determinations that the Act had been violated by the discharge of an employee involved in union activity. *N.L.R.B. v. Monroe Auto Equip. Co.,* 368 F.2d 975, 979–81 (8th Cir. 1966); *N.L.R.B. v. Garner Tool and Die Mfg. Co.,* 493 F.2d 263, 267–68 (8th Cir. 1974); *N.L.R.B. v. United Parcel Service, Inc.,* 317 F.2d 912, 914 (1st Cir. 1963); *N.L.R.B. v. Prince Macaroni Mfg. Co.,* 329 F.2d 803, 806 (1st Cir. 1964); *N.L.R.B. v. Dixie Terminal Co.,* 210 F.2d 538, 540, *cert. denied,* 347 U.S. 1015, 74 S.Ct. 871, 98 L.Ed. 1138 (1954). All of those cases are distinguishable, either because the employee had blatantly refused to accept a new assignment; because the employee had repeatedly violated company rules and was very insubordinate; because there was no evidence of anti-union feeling, or because there was no evidence that the company was aware of the employee's union activities. Clearly, there is more evidence here to support the Board finding than in those cases.

## The Truckdrivers' Case

▇ We now consider Jays' challenge to the Board's findings relative to the truckdrivers. It is well settled that an employer violates section 8(a)(1) of the Act when he engages in conduct which tends to interfere with his employees' rights to organize, form, join, or assist a union organization. *N.L.R.B. v. Illinois Tool Works,* 153 F.2d 811, 814 (7th Cir. 1946). Furthermore, in determining whether a violation occurred, the impact of all the statements made by management must be judged in the context of the effect they would have on an employee while he is in the employer-employee relationship. *N.L.R.B. v. Roselyn Bakeries, Inc.,* 471 F.2d 165, 167 (7th Cir. 1972). In considering the interrogations made in this matter by Jays' managers, Japp, Timmons, and Staton, the Board could reasonably conclude that these interrogations were unlawful. *See New Alaska Dev. Corp. v. N.L.R.B.,* 441 F.2d 491, 492–93 (7th Cir. 1971). The questions asked were not accompanied by assurances that there would be no reprisals. The fact that Japp, Staton, and Timmons all consistently received untruthful or noncommittal responses is evidence of the employees' anxiety over management's reaction to their union activity. Anxiety is symptomatic of fear, and it is unlawful to question so as to instill fear. *See Self-Reliance Ukrainian American Cooperative Ass'n v. N.L.R.B.,* 461 F.2d 33, 36 (7th Cir. 1972). The questions asked by Jays' managers of their employees were not the isolated interrogatories, free of coercion, which are protected by *N.L.R.B. v. Century Broadcasting Corp.,* 419 F.2d 771, 780 (8th Cir. 1969), and other cases cited to us by petitioner.

▇ Jays argues that the Staton interrogations, the bulk of the interrogations in the record, did not violate the Act because Staton was not a supervisor within the meaning of the Act, and because the company was not aware of and did not authorize Staton's questioning. Precedent and a fair reading of the Act constrain us to reject this argument. The Act states:

§ 152. Definitions.

When used in this subchapter—

\* \* \* \* \* \*

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly \* \* \*.

\* \* \* \* \* \*

(13) In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling. [29 U.S.C. §§ 152(2) and (13) (1970).]

The Supreme Court has stated that in this context of agency, we should not require a "strict application of the rules of *respondeat superior.*" We are dealing with a "clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence." *International Ass'n of Machinists v. N.L. R.B.,* 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940). In this case, the Board found Staton to be a supervisory employee with the authority, at least, to fire employees. In the light of the Supreme Court's liberal definition of agency in labor cases, Staton qualifies as an "employer" within the meaning of the Act. Furthermore, the possibility that the company may not have authorized or known of Staton's questioning does not free Jays of responsibility for his actions. *Local 636, United Ass'n of Plumbing and Pipefitting Industry v. N.L. R.B.,* 109 U.S.App.D.C. 315, 287 F.2d 354, 361 (1961).

■ The threats and promises made by Marttila and Japp were also unlawful.

\* \* \* an employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition. \* \* \* [*N.L.R.B. v. River Togs, Inc.,* 382 F.2d 198, 202 (2d Cir. 1967), *cited in N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 619, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).]

The threats made by Marttila and Japp on October 3, 1975, fall in the latter category. Moreover, promises made coincident with threats prior to an important union organizational activity, such as the Saturday, October 4 meeting with the Teamsters, are also illegal. *See Wassau Steel Corp. v. N.L. R.B..,* 377 F.2d 369, 371–72 (7th Cir. 1967).

■ With respect to the decision by Jays to contract its trucking operation to Nielsen Cartage Co., this court has stated in *N.L. R.B. v. Townhouse T.V. & Appliance, Inc.,* 531 F.2d 826, 828–29 (7th Cir. 1976) that:

It is well settled that an employer violates Sections 8(a)(3) and (1) of the Act by subcontracting part of an integrated business and dismissing the persons employed therein if the action is motivated at least in part by antiunion considerations. \* \* \*

In view of Jays' illegal campaign to prevent its truckdrivers from joining the Teamsters' union, coupled with the fact that Jays was satisfied with performing its own trucking operation until a time almost simultaneous with the truckdrivers' union activity, the Board could reasonably conclude that Jays' decision to contract to Nielsen was motivated at least in part by antiunion considerations. Thus this case is distinguishable from *Jays Foods, Inc. v. N.L.R.B.,* 292 F.2d 317 (7th Cir. 1961), wherein Jays' decision to contract out its truck repair and maintenance operations was found to have been made solely to avert a threatened economic loss. The facts in that prior case established that Jays had seriously considered contracting out its maintenance operations on several occasions for almost 1½ years prior to making its decision to do so. We reject Jays' arguments on this issue. The cases which it cites, *N.L.R.B. v. Kingsford,* 313 F.2d 826, 829 (6th Cir. 1963); *N.L.R.B. v. Lassing,* 284 F.2d 781 (6th Cir. 1960), and other cases, are distinguishable. In those cases the court found that the contracts involved were made solely for economic reasons.

Jays also challenges the sufficiency of the evidence relied upon by the Board. But we find there is substantive circumstantial and

direct evidence to support the Board's decision. It is the kind of evidence the Supreme Court decided is sufficient to uphold the Board's decision. See *N.L.R.B. v. Link-Belt Co.*, 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941). In essence, our assessment of the record is well stated in a prior decision of this court:

> * * * Under *Universal Camera Corp. v. NLRB* * * * such findings being supported by substantial evidence on the whole record must be accepted here. Having examined the whole record, we find such substantial support. Even though we might feel inclined to tip the scales the other way * * * we are not at liberty to do so. [*Von Solbrig Hospital, Inc. v. N.L.R.B.*, 465 F.2d 173, 175 (7th Cir. 1972).]

Finally, Jays argues that we should reverse the findings of the Board on both issues because the Administrative Law Judge uniformly credited the N.L.R.B. General Counsel's witnesses in making his determinations of fact. As this court has stated previously, "it is the function of the Administrative Law Judge and the Board to make credibility determinations, not this Court." *N.L.R.B. v. Townhouse T.V. & Appliance, Inc.*, supra, 531 F.2d at 829. Moreover, even "total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact." *N.L.R.B. v. Pittsburgh Steamship Co.*, 337 U.S. 656, 659, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949).

### Truckdrivers' Remedy

The recommended order of the Administrative Law Judge required Jays to reimburse the 26 discharged truckdrivers "for any loss of pay and benefits * * * until such time as those employees obtain, or have obtained substantially equivalent employment * * *." (Petitioner's app. at 74.) He did not order Jays to resume its trucking operation, because he found that Nielsen had "voluntarily hired 23 of the 26 discharged employees" and "their wages and benefits may be better than enjoyed before Jays contracted out the operation." [*Id.*] The Board, however, reversed the order of the Administrative Law Judge and ordered Jays to resume its trucking operation. The Board found that the remedy of resumption of operations is the normal remedy unless the resumption would create undue hardship. *N.L.R.B. v. Townhouse T.V. & Appliance, Inc.*, supra, 531 F.2d at 831–32. The Administrative Law Judge found Jays to be financially sound and that resumption of its prior operation would not create undue hardship. Therefore, the Board ordered Jays to resume its trucking operation. The Board assumed that although the discriminatees working for Nielsen are now paid a higher hourly wage than Jays paid them, they may have received similar raises had they remained at Jays. Furthermore, the Board noted that at Jays the truckdrivers received some benefits which they do not receive at Nielsen, such as cash Christmas presents, free meals and coffee. Finally, the Board stated that their seniority at Nielsen "may not compare with that enjoyed at Jays Foods." [Petitioner's app. at 109.]

We agree that the resumption of delivery operations by Jays would not be "an undue hardship" as that term has been interpreted in the decisional law. However, there are other facts in this case which persuade us that the remedy fashioned by the Board for the truckdrivers is not adapted to the situation before us and constitutes an abuse of the discretion vested in the Board.

The Administrative Law Judge found that the evidence would not support a finding that Nielsen knew or should be charged with knowledge of Jays' unfair labor practices and is not responsible for remedying such unfair labor practices. An order requiring Jays to resume its cartage operations might very well impose an unwarranted hardship on Nielsen, and at the same time be disadvantageous to the 23 truckdrivers employed by Nielsen. There is an offer of proof in the record that the 23 former Jays truckdrivers who were hired by Nielsen, were receiving $7.93 per hour shortly after their being so hired in the early part of 1976, whereas they were being paid only $6.50 per hour in November 1975 while em-

ployed by Jays. We accept this as a fact and we note that the Administrative Law Judge assumed that their wages are higher than Jays paid them. In addition, the truckdrivers employed by Nielsen received certain insurance benefits as a result of their mandatory union status which they did not have as employees of Jays. Furthermore, it is uncertain that if Jays were ordered to resume deliveries, it would give the truckdrivers the same increase in pay which they might have received had Jays continued the delivery operations after November 1975. If we were to permit the Board's order to stand, based as it is on speculative and uncertain theories as to what will make the employees whole, the result might well be a reduction in their pay and a loss of other benefits.

Even if Jays is ordered to resume the trucking operation, there is nothing to prevent it from recontracting that operation to Nielsen or some other company for sound business reasons. It is undisputed that Jays has experienced a substantial savings in cost, and it claims an improvement in operating efficiency, as a result of the contract entered into with Nielsen. Consequently Jays could conceivably recontract the delivery operation to Nielsen solely for legitimate business purposes and without any demonstrated motive to violate any of the rights granted to their employees under the law. *See N.L.R.B. v. Preston Feed Corp.,* 309 F.2d 346, 352 (4th Cir. 1962). If that were to occur, the 23 truckdrivers now employed by Nielsen would have just cause for believing that the result of this litigation has been to put them on an employment merry-go-round, each revolution of which is fraught with uncertainty as to whether their lot in life has actually been improved.

Three of the discharged truckdrivers were not hired by Nielsen, but in our opinion, the order proposed by the Administrative Law Judge will provide an adequate remedy for the unfair labor practices affecting them.

For all of these reasons, we conclude that the Board's order with respect to the remedy provided for the truckdrivers will not properly effectuate the purposes of the National Labor Relations Act and that the order recommended by the Administrative Law Judge should be adopted in lieu thereof.

### Conclusion

In summary, it is ordered that the Board's order shall be enforced in all respects, except that the Board's order with respect to the remedy in behalf of the truckdrivers is hereby modified and the order proposed by the Administrative Law Judge [2] is substituted therefor.

2. The decision of the Administrative Law Judge is printed in full in the petitioner's appendix at pages 27–81 and his remedy appears on pages 77–79.