UNITED STATES of America,

v.

CENTURY CLINIC, INC., et al.

No. CV–N–93–194–ECR(RAM).

United States District Court,
D. Nevada.

March 23, 1998.

Stuart Gerson, Eugene M. Thirolf, Drake Cutini, Asst. Attorney General, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, Paige Harrison, Office of General Counsel, U.S. Food & Drug Admin., Rockville, MD, for plaintiff.

Thomas C. Bradley, Reno, NV, Bradford Reynolds, Washington, DC, William H.

Webster, Washington, DC, for defendants Century Clinic & Katrina Tang.

### MINUTES OF THE COURT

EDWARD C. REED, Jr., District Judge.

*MINUTE ORDER IN CHAMBERS*

**IT IS HEREBY ORDERED** that Defendants' Objection (# 33), filed on March 6, 1998, to the Magistrate Judge's Report and Recommendation (# 31), entered on February 4, 1998, is **OVERRULED** and said Report and Recommendation is **AFFIRMED** and **ADOPTED.**

**IT IS FURTHER ORDERED** that Defendants' petition (# 4) for review of final agency action is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' request (# 24) for oral argument is **DENIED.**

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment in favor of Plaintiff United States of America and against all Defendants in the sum of $400,-000.

Defendants Century Clinic and Dr. Katrina Tang entered into a consent decree with the Food and Drug Administration ("FDA") in 1993, in which they agreed not to use the "LISTEN System" acupuncture screening device except for investigational purposes—i.e., for testing the device's efficacy—pursuant to an "investigational device exemption" ("IDE"): Admin. Record, Vol. VII, Ex. J, p. 2. The LISTEN System is apparently simply a ohmmeter: it measures electrical resistance, relative to some reference value, at various points on the human body, in aid of an acupuncturist's or homeopathic physician's diagnosis. It is undisputed that Defendants received approval to so use a LISTEN device pursuant to another firm's IDE. In 1994, however, the FDA sent an undercover investigator to the Century Clinic to determine whether Defendants were in compliance with the consent decree.

The Magistrate Judge carefully considered all arguments raised by Defendants, and correctly concluded that the investiga-tor's report shows a use of the LISTEN System in a manner not permitted by the IDE protocol, and therefore not permitted by the consent decree. For example, Dr. Tang used the LISTEN device to diagnose an exposure to certain metals: "this indicator even told me you been exposed to a little copper and aluminum." Admin. Record, Vol. VIII, Ex. DD, p. 24. A few minutes later an employee of the Century Clinic (later identified as one Rosario Quintana) conferred with the investigator about the need for numerous expensive follow-up tests for, among other things, determining the level of aluminum in the investigator's body. *Id.* at p. 28.

This is merely one example of Defendants' use of the LISTEN device in a manner not permitted by the consent decree, specifically, diagnostically rather than investigationally. Defendants nonetheless raise a number of arguments, none of which help them. They argue that the LISTEN System was not actually "used," since it was eventually determined that the system did not work at all; this is immaterial, however, since Dr. Tang *purported* to use it, and it would make little sense to disallow actual use while allowing fraudulent or improper use of a proscribed medical device. Defendants further assert that the investigator's report is unreliable, unauthenticated hearsay; the Federal Rules of Evidence generally do not apply to administrative proceedings, however, as the United States correctly notes. Opp'n Br. at 39–40(# 20), and cases cited therein. Defendants present other arguments, but they are irrelevant to the question presented.

In short, the Magistrate Judge correctly concluded that the FDA Hearing Officer's finding of contempt was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence. Defendants do not dispute the rather hefty size of the $400,000 civil contempt fine. Finally, oral argument would clearly not be helpful.

### REPORT & RECOMMENDATION
### U.S. MAGISTRATE JUDGE

McQUAID, United States Magistrate Judge.

This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., United States District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1–4.

This matter is before the court on Petitioners' appeal, made pursuant to 42 U.S.C. § 405(g), for judicial review of the final administrative decision of the United States Food and Drug Administration ("FDA"). The decision found Petitioners in contempt of a March 23, 1993, Consent Decree entered by this court, and assessed monetary penalties in the amount of four hundred thousand dollars ($400,000.00) (Doc. # 13). Respondent has submitted an opposition to Petitioners' appeal (Doc. # 20), and Petitioners have replied (Doc. # 23).

### I. BACKGROUND

On March 23, 1993, Petitioners entered into a Consent Decree of Permanent Injunction ("Consent Decree") with the FDA, whereby the parties stipulated to certain matters relating to the use of various medical screening devices and agreed to monetary disciplinary sanctions for any violations of said decree. The Consent Decree provides that if the FDA discovers Petitioners have violated its terms, Petitioners will be required to forfeit two hundred thousand dollars ($200,000.00), per violation to the FDA, after written notice of said violations and an opportunity by Petitioners to challenge that finding. The decree further establishes procedures for the resolution of any dispute regarding compliance with the decree. This procedure is triggered by the FDA finding Century Clinic has violated the decree. Once a violation is charged, Century Clinic may

challenge that finding by submitting written materials and making an oral presentation before an FDA Hearing Officer ("ALJ"). If the decision of the FDA is affirmed by the ALJ, that determination may be further challenged in the District Court, through complete review of the administrative record under the arbitrary and capricious standard.

### 1. Consent Decree

The Consent Decree was entered into on March 23, 1993. Parties to the decree are Century Clinic, Katrina Tang, M.D., H.M.D., ("Dr.Tang") and Tiwen Tang, M.D.[1], both employees of the Clinic, and the United States Department of Justice. The decree was signed in an attempt to resolve problems resulting from criminal allegations and subsequent investigations directed at Petitioners' use of an electro-acupuncture device, known as the EAV Dermatron. The EAV Dermatron is a medical device, an ohmmeter, used to detect abnormal energy patterns in the human body. The FDA alleged that Petitioners were using the EAV Dermatron to fraudulently diagnose patients with various diseases, such as the Bubonic plague, "exposure to hepatitis," "Epstein Barr Syndrome," and "Nevada underground radiation." (Doc. # 20 at 1). The FDA further alleged that Petitioners would recommend that patients undergo expensive tests and treatments pursuant to such diagnosis'. (Id.).

The relevant provisions of the Consent Decree prohibit Petitioners from using electro-acupuncture screening devices, such as the EAV Dermatron and including specifically by name the LISTEN System device,

"unless and until: (1) there is in effect an approved application for premarket approval (PMA), pursuant to 21 U.S.C. § 360e, or an approved application for an investigational device exemption

---

**1.** Tiwen Tang is no longer practicing medicine or affiliated with the operations of Century Clinic. Further, although he was a party

to the Consent Decree, he is not a party to this action.

(IDE), pursuant to 21 U.S.C. § 360j(g), that authorizes the defendants' use of such product(s); and (2) other FDA approval of such products as required by the Act and implementing regulations has been obtained." (Consent Decree, Adm.R. Vol. VII Ex. J. at p. 2).

An IDE permits an untested and unapproved device to be utilized for investigational purposes only. FDA regulations require that the investigational study be implemented specifically· as described in an FDA approved application or pursuant to an Investigational Relations Board ("IRB") approval that strictly follows IDE regulations. (*See* 21 C.F.R. Part 812). The purpose of an IDE is to protect the health and safety of human subjects exposed to unapproved medical devices. The IDE application calls for thorough and detailed information regarding the proposed investigatory study. The application process aids the FDA in ensuring that safety standards are maintained without unduly hampering the discovery and development of useful medical devices. If a device is used in any manner not specifically documented in the IDE, the device is not used with FDA approval. Because of the health risks involved in testing unapproved devices, FDA's regulations are explicit and approved testing, pursuant to an IDE, is monitored carefully. (*See* 21 C.F.R. § 812.46).

### 2. *Biosource, Inc.*

On August 6, 1993, Biosource Inc., ("Biosource") a private medical research company, filed an application for an IDE, pursuant to 21 U.S.C. § 360j(g). In the application, Biosource proposed to study a Life Information System Ten device, a machine used for electro-dermal screening. This device is commonly known as the LISTEN System device and is used for the limited purpose of detecting diabetes. The LISTEN System device operates in essentially the same manner as the EAV Dermatron, the device that prompted the consent decree. Both devices are used to detect and record energy imbalances by testing various conductance points associ-

ated with specific organs or systems in the human body. The major difference between the devices is that the LISTEN System is hooked up to a computer and the EAV Dermatron to a dial.

On September 10, 1993, the FDA conditionally approved Biosource's IDE application. The purpose of the Biosource study was to determine if the data collected from the LISTEN System device could differentiate persons with insulin dependent diabetes from persons having normal glucose levels without insulin. (Investigational Plan, Adm.R. Vol. VII Ex. M. at 1). Specifically, the conditionally approved IDE stated that the study would require use of the LISTEN System device to collect data only. (*Id.* at 33). The test on diabetes was then to be done by comparing the data collected by the LISTEN System to data from a blood test that measured glucose levels. In October 1993, Petitioners were chosen to participate in the Biosource study as clinical investigators. To prepare for the study, Petitioners purchased two LISTEN System devices and began the training process, prescribed by Biosource, which encouraged clinical investigators to practice on "as many patients as possible." Petitioners contend they did this without recording or gathering any patient data at the instruction of Biosource, in order to gain familiarity with and accuracy on the device. The FDA contends that instead of using the LISTEN System device for the diabetes mellitus study, for which it was approved, Petitioners used the device in the same manner as they used the EAV Dermatron, i.e. to diagnose patients with various diseases and then to recommend expensive follow up tests and treatments. The FDA concluded that this was an unauthorized use of the device and, therefore, Petitioners were in violation of the Consent Decree.

### 3. *FDA Notification of Non–Compliance*

On February 25, 1994, the FDA notified Century Clinic, Inc., by way of a letter of

non-compliance, that Petitioners Century Clinic Inc., Katrina Tang, M.D., H.M.D., and employees Rosario Quintana and Herbert Ellingwood, Esq., had violated the Consent Decree by using two LISTEN System devices outside of the study permitted under the Biosource IDE and were required to forfeit two hundred thousand dollars ($200,000.00) per violation.[2] Specifically the FDA cited Petitioners for using the LISTEN System to diagnose serious medical diseases, and for failing to follow the guidelines of a clinical investigator as per the approved Biosource IDE. They contend Petitioners did not gather screening data called for by the IDE, or the blood glucose levels to be compared to that data. Further, they contend Petitioners used the LISTEN System device without following IDE protocol or FDA regulations and without keeping records required of an investigator under those regulations. The FDA's findings and conclusions were based on two investigations conducted in February of 1994. The first investigation included an undercover operation, wherein an FDA investigator, Beverley Ritter, posed as a patient and was tested with the LISTEN System device. Investigator Ritter reported that during or immediately following her exposure to the LISTEN System device, Dr. Tang informed her that the device indicated abnormalities with her lymphatic, nervous and circulatory systems, that she was hypoglycemic, had the Epstein Barr virus, had been exposed to aluminum, and did not have any strain of HIV. (Undercover Investigation Transcript, Adm.R. Vol. VIII Ex. DD at 13–24). Dr. Tang further informed Investigator Ritter that the device could detect cancer, infections and inflammations. (*Id.* at 7). During the testing, Dr. Tang placed ampules labeled with names of different viruses, as well as various chemicals, pesticides and vaccines onto a circular metal plate in an attempt to "normalize" the readings of the LISTEN System device. (*Id.* at 14–20). After the testing was com-

plete, Dr. Tang recommended that Investigator Ritter undergo a number of subsequent tests and procedures, including but not limited to a costly blood test for aluminum. (*Id.* at 28). This investigation led the FDA to conclude that Dr. Tang was in violation of the Consent Decree, and also led to a subsequent investigation.

On February 10–11, 1994, the FDA inspected Century Clinic once again. The FDA found that although engaged in the Biosource study, Century Clinic was not collecting any data from patients exposed to the LISTEN System device. (February 1994 Inspection Memorandum, Adm.R. Vol. VIII Ex. HH at 3). Further the investigators interviewed six employees who offered conflicting testimony when questioned about the manner in which the device was used. (*Id.* at 5–10). Dr. Katrina Tang stated at first that she used the device "sometimes." She later changed her testimony to state that she didn't use it. (*Id.* at 5). Mr. Ellingwood, manager of Century Clinic, stated that the device was used on nearly every patient. (*Id.*). However, in his subsequent deposition this statement was denied. (Deposition of Herbert Ellingwood, Esq., Adm.R. Vol. II Ex. B at 45, 108). Ms. Rosario Quintana stated that the device was only used if patients were curious about it, and only one or two new patients were tested in the three months preceding the investigation, the last being two weeks prior to the investigation. (February 1994 Inspection Memorandum, Adm.R. Vol. VIII Ex. HH at 7). Ms. Quintana made this statement although she was present two days earlier when Investigator Ritter was examined with the device. Finally, Ms. Teresita O'Gorman told investigators that ten to twenty of every one hundred new patients was tested with the device. (*Id.* at 10). She further testified that she only used the device occasionally on a patient. Mr. Ellingwood testified that Ms. O'Gorman probably used the device more than anyone

---

**2.** Use of each device constitutes one violation. Because the FDA found that two devices were being used without authorization, two viola-

tions were cited and monetary penalties assessed accordingly.

else at the clinic. The FDA contends that there were five investigators present during the investigation of Century Clinic, all of whom were present during the interviews of the above-named employees. Based on the results of their inspection, the FDA concluded that Century Clinic had in fact violated the Consent Decree.

Petitioners immediately challenged the FDA's findings by following the procedures set forth in the consent decree for administrative review. They claimed that they used the LISTEN System device in accordance with Biosource's IDE. Further, they claimed they did not need to follow IDE protocol or maintain records of patients exposed to the device because they were merely in the training phase, and just practicing on patients. After reviewing the evidence presented by both parties, the ALJ affirmed the findings and conclusions of the FDA and adopted its recommendation to impose four hundred thousand dollars ($400,000.00) in fines for two cited violations of the Consent Decree. Petitioners subsequently instituted this action.

## II. *DISCUSSION*

### A. *Standard of Review*

 Review of agency determinations is limited to whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if it was taken without observance of procedure required by law. 5 U.S.C. § 706(2)(A); *Loomis Cabinet Co. v. OSHRC*, 20 F.3d 938, 941 (9th Cir.1994) (applying standard). Under the arbitrary and capricious standard, the court considers only whether the agency's decision is based on a reasoned evaluation of the relevant factors. *Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1466 (9th Cir.1996); *California Trout v. Schaefer*, 58 F.3d 469, 473 (9th Cir.1995). The court may reverse only where the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs coun-

ter to the evidence before the agency, or it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Western Radio Services Co. v. Espy*, 79 F.3d 896, 900 (9th Cir.1996) *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996); *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir.1994). Thus, the scope under the arbitrary and capricious standard is narrow, and a court may not substitute its judgment for that of the agency. *Railway Labor Executives' Ass'n v. I.C.C.*, 784 F.2d 959, 970 (9th Cir.1986); *Dept. of Water and Power of the City of L.A. v. Bonneville Power Admin.*, 759 F.2d 684, 691 (9th Cir.1985).

 A hearing officer's factual findings are reviewed under the substantial evidence standard and reasonable factual inferences drawn by the officer are accepted. *Phelps Dodge Corp. v. OSHRC*, 725 F.2d 1237, 1239 (9th Cir.1984). A fact finder's determinations are upheld " . . . if the record contains such relevant evidence as reasonable minds might accept as adequate to support a conclusion, even if it is possible to draw different conclusions from the evidence." *Loomis Cabinet Co.*, 20 F.3d at 941; *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987). The reviewing court will let the agency's decision stand if the evidence before the agency "provided a rational and ample basis for it." *Systech Environmental Corp. v. U.S. Environmental Protection Agency*, 55 F.3d 1466, 1469 (9th Cir. 1995) (quoting *Northwest Motorcycle Ass'n v. United States Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir.1994)).

Petitioners challenge the ALJ's Opinion on three grounds. First, they contend the ALJ applied the wrong standard of proof to the administrative review. (Doc. # 13). Second, that he erred in finding Petitioners lacked proper authorization to use the LISTEN System to "practice" on patients for the FDA approved Biosource research study. (*Id.*). And finally, Petitioners contend that the ALJ erred in finding Petitioners were using the LISTEN System

device for "diagnostic" purposes in order to induce follow-up tests and treatment. (*Id.*). The court will address these issues in turn.

## B. *Burden of Proof: "Clear and Convincing" v. "Preponderance of Evidence"*

Petitioners initially argue that the ALJ applied the wrong burden of proof in affirming the alleged violations of the Consent Decree. To wit, they claim that the ALJ erroneously characterized the proceeding as an administrative "assessment of damages" controversy requiring proof by a "preponderance of the evidence" as opposed to a civil contempt proceeding requiring proof of "clear and convincing evidence." (Doc. # 13 at 26). While Petitioners are correct in their contention that civil contempt hearings generally require a showing of proof of a violation by "clear and convincing" evidence, they have misconstrued the intent and application of the standard by the ALJ.

### 1. *Application of Standard*

The relevant standard of review is sometimes critical to the outcome of a case. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir.1992) ("The relevant standards of review are critical to the outcome of this case."), *cert. denied*, 510 U.S. 843, 114 S.Ct. 131, 126 L.Ed.2d 94 (1993); *Walsh v. Centeio*, 692 F.2d 1239, 1241 (9th Cir.1982) ("the outcome of the instant case turns on the standard of review"). Petitioners claim that this is true in this case. They contend the ALJ identified the applicable legal standard as a "preponderance of the evidence" or alternatively decided that the FDA's facts had to be "highly probable," and that he was wrong in both respects. (Doc. # 13 at 21). Further, Petitioners maintain that had the "clear and convincing" standard of evidence been utilized they could never have been found in contempt.

While it is true the ALJ offered his opinion as to the nature of the hearing, he did so in a footnote, and nevertheless declined to determine which standard

should govern the proceeding. The ALJ's Opinion states, "I do not need to reach the issue of which standard is applicable, given that I find that FDA has proven its charges even under the judicial civil contempt standard of 'clear and convincing evidence.' " (Hearing Officer's Opinion, Adm.R. Vol. IX Ex. MM at 29). In some cases, courts have elected not to decide which standard of review is applicable given that the outcome of the case would not change by applying a different standard of review. See, e.g., *In re Grand Jury Proceedings*, 87 F.3d 377, 380 (9th Cir.1996); *Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1456 n. 6 (9th Cir. 1996); *United States v. Mendelsohn*, 896 F.2d 1183, 1185 n. 1 (9th Cir.1990). Moreover, the Supreme Court has suggested that it is "undesirable to make the law more complicated by proliferating review standards without good reason." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995). In this case, the ALJ made the decision not to set a standard because it would not affect the outcome of the case. His opinion states, "[b]ased on the evidence, I find that the District has sustained its burden of establishing that Century Clinic violated the terms of the Consent Decree, whether the standard of proof is a preponderance of the evidence or clear and convincing evidence." (Hearing Officer's Opinion, Adm.R. Vol. IX Ex. MM at 29).

 Notwithstanding his refusal to pinpoint a specific standard, the ALJ ultimately applies the higher burden of proof, that of clear and convincing evidence, in affirming the FDA's findings. The clear and convincing standard of proof requires evidence sufficient to reasonably satisfy the fact finder that it is highly probable the ultimate fact at issue happened. *See generally, Colorado v. New Mexico*, 467 U.S. 310, 315, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984); *In re Dual–Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693 (9th Cir.1993); *Vertex Distrib.,*

*Inc., v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir.1982). The ALJ found that Petitioners failed to comply with the specific terms of the Consent Decree. He found the terms of the Consent Decree were explicit and that Petitioners did not present *any* evidence, let alone substantial evidence, that would establish that they complied with the decree, nor any evidence that would support that they took all "reasonable steps" to comply. (Hearing Officer's Opinion, Adm.R. Vol. IX at 29–30). In reviewing the entire administrative record and the ALJ's analysis, there is nothing to support the contention that the ALJ acted in an arbitrary or capricious manner by not specifying a standard of proof. To the contrary, there is sufficient evidence in the administrative record to provide a rational and ample basis for his decision not to do so.

### 2. *Deliberate Defiance and Willful Disobedience*

█ Petitioners support their position that the FDA could not find them in contempt by clear and convincing evidence by asserting that to prove non-compliance with or to find one in contempt of a consent decree, the violation must be made in "deliberate defiance and willful disobedience of the court." (Doc. # 13 at 27, citing *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d at 777–78, n. 1). Petitioners would be right in this contention, if this were a criminal contempt hearing. "Wilfulness is an essential element of criminal contempt." *U.S. v. Armstrong*, 781 F.2d 700, 706 (9th Cir.1986). However, this is not a criminal contempt hearing but rather one sounding in civil contempt. Wilfulness is *not* required for a finding of civil contempt, however, civil contempt may be based on wilful behavior. *U.S. v. Laurins*, 857 F.2d 529, 535 (9th Cir.1988) *cert. denied* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (Emphasis added). Petitioners contend that if they did stray at all from the provisions of the Consent Decree, the diversions were merely technical and were not intentional, wilful or deliberate. (Doc. # 13 at 27–28). "An act

does not cease to be a violation of law and of a decree merely because it may have been done innocently." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). Again, there is no scienter requirement for a finding of civil contempt. *Id.* Petitioners argument fails on this basis.

### 3. *Issues of Credibility*

Petitioners repeatedly emphasize that they have presented numerous witnesses who have testified under oath and have been subjected to cross-examination regarding the merits of this action, their professional ability, and the quality of their medical practice and patient record-keeping. (Doc. # 13 at 17–19, 22, 41–42). According to Petitioners, they each complied fully with the terms of the Consent Decree and have always engaged in commendable services for those who desire and those who need homeopathic medical treatment. They have also presented numerous letters from satisfied patients in support of their medical competency. (Letters to Herb Ellingwood in Support of Century Clinic and Katrina Tang, Adm.R. Vol. VIII Ex. CC). In addition to promoting the reliability of their proffered evidence, Petitioners have attacked the credibility of respondent's case. Petitioners specifically challenge respondent's evidence as unverified, speculative, incomplete and unauthenticated. (Doc. # 13 at 17–19, 22, 41–42). Petitioners argue the weight and credibility of their evidence alone is enough to override the FDA's burden of clear and convincing evidence. (*Id.*).

█ Questions of credibility and resolution of conflicts in testimony are addressed to the ALJ. *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir.1988); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). Decisions of ALJ's have not been reversed simply because the ALJ uniformly credited one parties witnesses in making his determinations of fact. *Jays Foods, Inc. v. N.L.R.B.*, 573 F.2d 438, 446, (7th Cir.1978) *cert. denied* 439 U.S. 859, 99

S.Ct. 176, 58 L.Ed.2d 167 (1978). Great deference shall be given to credibility determinations made by the ALJ. *Sierra Club v. U.S. Nuclear Regulatory Com'n* 862 F.2d 222, 230 (9th Cir.1988). "When substantial evidence supports ... a finding of fact and especially when the credibility of witnesses is involved, we [the court] will not disturb that finding on review." *Dorris v. Director, OWCP*, 808 F.2d 1362, 1364 (9th Cir.1987).

■ Although Petitioners disagree with any findings that may have been based upon unsworn FDA evidence, the agency is "... free in its exercise of expertise to give conflicting evidence whatever weight it deems appropriate in light of the accuracy and credibility of such evidence." *Babbitt*, 82 F.3d at 1463. As long as there is ample evidence supporting the agency determination, this court is not free to substitute its judgment for that of the agency. *Id.* The FDA has provided written summaries and transcripts of investigator Ritter's undercover investigation of Century Clinic in February 1994, as well as a memorandum of inspection conducted by five FDA employees on February 10–11, 1994. These documents form the basis for the finding of non-compliance. In addition, counsel for respondent participated in all depositions conducted by Petitioners, transcripts of which are included in the administrative review. In reviewing these depositions, the ALJ found that several of Century Clinic's witnesses provided conflicting versions of events, including how many times, by whom and for what purpose the LISTEN device was used. The ALJ further found that Century Clinic personnel occasionally altered their own statements, and some testimony, specifically that of Katrina Tang, was prompted or aided by attorney notes. The record reflects that when in possession of the notes, Dr. Tang testified from them verbatim. There is credible, accurate and substantiated evidence throughout the administrative record, which includes submissions from both parties, on which the ALJ based his decision. Therefore, Petitioners argument that the ALJ's findings are unsupported by the evidence must fail. Under these facts, there is sufficient evidence to support the ALJ's conclusions. He sets forth specific facts, drawn from the record, in a detailed and comprehensive manner to support his decision throughout his opinion. He is entitled to weigh the evidence and make his decisions accordingly. Here, he did so and his conclusions are supported by ample evidence in the record and are reasonable related to the agency action taken.

## C. *"Practicing" with the Listen System Device*

■ Before turning to the merits of this issue, the court will address Petitioners argument that the ALJ failed to "give even lip service" to the FDA's applicable regulations before finding that "practice" was an unauthorized use of the LISTEN System under the Consent Decree. (Doc. # 13 at 38). This contention is based upon the apparent ability of Biosource, as an authorized Sponsor, to be able to make changes and deviations from the Investigational Plan pursuant to 21 C.F.R. § 812.150(a)(4). In the proceedings before the ALJ, Petitioners failed to make this argument. Under the arbitrary and capricious standard, a reviewing court must consider only whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *See Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1521 (9th Cir.1995). As such, if a party fails to raise an issue before the agency, that issue is waived, and, absent exceptional circumstances, that party is precluded from presenting it to a reviewing court. *Marathon Oil Co. v. U.S.*, 807 F.2d 759 (9th Cir.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *see also, Reid v. Engen*, 765 F.2d 1457, 1460 (9th Cir.1985); *Bagues–Valles v. INS*, 779 F.2d 483, 484 (9th Cir.1985). If an argument is not brought before the hearing officer, a reviewing court cannot determine the soundness of the judgment on that issue. This court will not address the

merits of this challenge because Petitioners failed to raise this issue before the agency and further failed to note any exceptional circumstances that would warrant this court's review. As such, Petitioners have waived this argument.

Petitioners have raised several additional arguments to the "practice" claim that were reviewed by the ALJ. First, Petitioners charge that the Biosource IDE protocol provided for and moreover required a training period which included practicing with the LISTEN System device on as many patients as possible. (Doc. # 13 at 32–33). Further, Petitioners claim that during this training period they were not required to maintain records of the patients exposed to the device. (*Id.* at 34). Petitioners challenge the ALJ's finding that this practice was unauthorized. The ALJ found that even if the training period could be interpreted to include practice on human subjects, the device could still not be used, in any stage, without following IDE protocol and FDA regulations. (Hearing Officers Opinion, Adm.R. Vol. IX Ex. MM at 24). Further, the ALJ found that any permitted "practice" could only be to collect data for the diabetes study, not to test patients for various other diseases with the machine and the use of ampules. (*Id.*).

The court cannot find that the ALJ's finding that Petitioners' use of the LISTEN System device for practice was an unauthorized use was arbitrary or capricious. Rather, the finding was eminently reasonable. Petitioners repeatedly place blame on Biosource, the diabetes metillus study Sponsor, for their actions. However, Biosource did not voluntarily entered into a court approved consent decree, and is not bound by its terms. Petitioners did and are. As the ALJ notes, relying solely on the Sponsor is not a justifiable excuse for straying from the provisions of the decree. Petitioners admit they didn't contact the FDA directly regarding the diabetes study protocol or Biosource IDE. (Deposition of Herbert Ellingwood, Esq., Adm.R. Vol. II at 114).

In addition, Dr. Tang admits that during the practice period she did not follow the Biosource IDE. (Deposition of Katrina Tang, M.D., H.M.D., Adm.R. Vol. I at 150–151). Further, Willis Clark, IRB monitor for the Biosource training program failed to inform the FDA that patients were being used for practice on the device, and does not recall any correspondence regarding practicing on patients. (Deposition of Willis Clark, Adm.R. Vol. V at 89–90). Contrary to Petitioners assertions, the record provides sufficient evidence to support the ALJ's determination that Petitioners did not take "all reasonable steps within [their] power to insure compliance," with the Consent Decree. (Hearing Officer's Opinion, Adm.R. Vol. IX at 27).

The ALJ also considered Dr. Tang's use of ampules of homeopathic solutions, during "practice" on patients. He found, and there is no dispute, that these ampules had nothing to do with the diabetes study, but rather could balance energy readings dealing with other diseases including, but not limited to, Parvo, Hepatitis and Epstein Barr syndrome. Again, petitioners defend the use of the ampules by stating that they were instructed to use them at the Level I training by Biosource. (*Id.* at 36). However, Dr. Tang admitted that she learned to use the ampules by watching several other doctors, prior to the Biosource study, and could not remember such instruction being given at the Level I training. (Deposition of Katrina Tang, Adm.R. Vol. I Ex. A, at 252–254). Collectively, the ALJ determined that this evidence was sufficient to prove petitioners violated the Consent Decree. He found that the Clinic's "practice" including use of plates and ampules was not described in the investigational plan, and as such Sponsor approval was not enough and FDA approval, which was never sought, was necessary. The ALJ's determinations with respect to the issue of "practice" are grounded on reasonable inferences drawn from the facts. He did not act arbitrarily in affirming the FDA's notice of violations in this respect.

**1138**

## D. *Use of the LISTEN SYSTEM Device for Diagnostic Purposes*

Petitioners contend that the LISTEN System device was never used for diagnostic purposes, and further that it cannot be used for such purposes as it is not a diagnostic machine, rather an indicator, much like a thermometer. (Doc. # 13 at 42). Petitioners attack the credibility of the FDA's evidence on this issue and maintain that any patient diagnosis occurred prior to his or her exposure to the LISTEN System device. (*Id.* at 44). Contrary to petitioners' position, the ALJ found that the evidence conclusively established, "... the clinic used the LISTEN System for the purpose of determining whether it appeared that patients had serious diseases and conditions, which findings the patients were told would need to be verified by (expensive) tests." (Hearing Officer's Opinion, Adm.R. Vol. IX Ex. MM at 13).

■■ The facts suggest that there is conflicting evidence as to when and how the LISTEN device was used by Century Clinic. Most of the conflicts occur within petitioners' evidence. As noted before, six different employees were interviewed by FDA investigators prior to finding any violations of the Consent Decree. These six employees each told different stories relating to the frequency and purpose of the use of the machine. In addition, it is undisputed that after examining Investigator Ritter, Dr. Tang recommended expensive follow up tests for a variety of health problems. A number of these tests corresponded with abnormalities discovered by the LISTEN System device while screening Investigator Ritter. For instance, Dr. Tang recommended Investigator Ritter undergo a blood test to detect aluminum in her system. Dr. Tang's discovery of any presence of aluminum in Ms. Ritter's system occurred during the screening process on the LISTEN System device. It is clear that the recommendation for a blood test for aluminum, as well as all other tests, was made subsequent to that procedure. Petitioners argue that Dr. Tang did not offer any diagnosis regarding the imba-

lanced conductance readings suggesting exposure to copper and aluminum. However, Dr. Tang did recommend a follow-up test involving the same. It was not unreasonable for the ALJ to infer from these facts that the tests were prompted by "indications" from the LISTEN System device. It is much more unlikely that Dr. Tang would recommend the aluminum test prior to some indication of the presence of the metal. The ALJ also noted that Dr. Tang stated that, "the LISTEN System device could be used to detect infections, inflammations and cancer." (Hearing Officer's Opinion, Adm.R. Vol. IX at 14–15). In fact, after the device would "indicate" a certain disease may exist, such as hepatitis, Dr. Tang would place ampules on a metal plate on the device to see whether the correlating solutions would normalize the readings. Here again, it is reasonable to infer that if the device can detect various diseases, and the solutions in the ampules can normalize the readings, the device can be used in part to formulate a diagnosis or at least to prompt the recommendation of follow-up exams. In fact, Willis Clark, IRB Monitor for the Biosource admitted that a person may find LISTEN information helpful in making a total diagnosis. (Deposition of Willis Clark, Adm.R. Vol. V at 109). There is ample evidence in the record to suggest Dr. Katrina Tang used the LISTEN System device in part to articulate her final diagnosis of a patients condition or at least to confirm prior diagnosis or suggest follow-up testing. The ALJ did not act in an arbitrary or capricious manner in affirming this finding.

## III. CONCLUSION

There was substantial evidence before the ALJ to determine that the FDA had sufficient factual support for its determination that Petitioners had violated the March 23, 1993, Consent Decree. The evidence in the administrative record established that as a result of Complaints filed by the FDA, Petitioners entered into a consent decree resulting in an agreement

to refrain from using various medical devices, specifically here the LISTEN System device, unless an approved application for pre-market approval ("PMA"), pursuant to 21 U.S.C. § 360(e), or an approved application for an investigational device exemption, pursuant to 21 U.S.C. § 360j(g), authorized their use of such devices. The evidence further established that Petitioners engaged in such prohibited activity after entering into the Consent Decree. There is no dispute that a PMA for the LISTEN System device was never filed and there is ample evidence in the administrative record to show unauthorized use of the device, under the Biosource IDE and FDA regulations. Such facts constitute substantial evidence of Petitioners violations of the decree. Viewing the Consent Decree in its entirety, together with the complete administrative record, the ALJ concluded that Petitioners violated both the letter and the spirit of the Consent Decree. In affirming the violations and imposition of penalties, the ALJ did not act in an arbitrary or capricious manner.

## IV. *RECOMMENDATION*

**IT IS THEREFORE RECOMMENDED** that the District Court enter its Order *AFFIRMING* the ALJ's decision finding non-compliance with the Consent Decree and assessment of monetary penalties in the amount of four hundred thousand dollars ($400,000.00).

Feb. 4, 1998.